**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MILLIMAN, INC., MILLIMAN SOLUTIONS, LLC, and VIGILYTICS LLC, | ) ) ) | Civil Action No. |
| | ) | |
| Plaintiffs, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| vs. | ) | |
| GRADIENT A.I. CORP., STANFORD A. SMITH, and SAMUEL CHASE PETTUS, | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**COMPLAINT**

Milliman, Inc. ("Milliman"), Milliman Solutions, LLC ("Milliman Solutions") and

Vigilytics LLC ("Vigilytics") (collectively, "Plaintiffs"), by and through their undersigned

counsel, hereby file this Complaint against Gradient A.I. Corp. ("Gradient"), Stanford A. Smith

("Mr. Smith"), and Samuel Chase Pettus ("Mr. Pettus") (collectively, "Defendants"), alleging as

follows:

**NATURE OF THE ACTION**

1.      After over six years as a highly placed practice leader at Milliman, in 2018, Mr.

Smith purchased from Milliman a "gradient A.I." software platform developed at Milliman and

left Milliman to form a new company, Gradient.  The "gradient A.I." platform Milliman

transferred to Gradient was specifically targeted at providing a solution for managing workers'

compensation risk, and was not used in the field of health insurance.

2.      Mr. Smith now serves as Gradient's Chief Executive Officer, with another former

Milliman employee, Mr. Pettus, serving as Gradient's Sales Director, Health.  In violation of

Milliman's trade secret rights, in addition to Mr. Smith's and Mr. Pettus' confidentiality

agreements with Milliman, Mr. Smith and Mr. Pettus have unlawfully deployed Milliman's

confidential and trade secret information that they learned while at Milliman for their new employer's benefit, positioning Gradient to begin competing directly with Milliman in the field of health insurance less than two years after Gradient's formation.  Gradient now offers a competing health insurance underwriting platform that misappropriates Milliman's trade secrets and infringes patents Milliman and Milliman Solutions exclusively license from Vigilytics.

3.      Milliman and Milliman Solutions exclusively license from Vigilytics several patents relating generally to, among other things, novel and innovative computer systems that process individuals' de-identified health information to avoid the need for individual disclosure consents under privacy laws by matching encrypted tokens, where one set of tokens identify the individuals such that the identities of the individuals are not attainable from the tokens, and the other set of tokens correspond to de-identified healthcare data.  The patents include U.S. Patent Nos. 9,118,641 (the "'641 Patent"); 9,323,892 (the "'892 Patent"); 9,665,685 (the "'685 Patent"); 9,965,651 (the "'651 Patent"); 10,109,375 (the "'375 Patent"); and 10,886,012 (the "'012 Patent") (collectively, the "Asserted Patents").

4.      Milliman is a leading actuarial and consulting firm for the insurance industry that, among other things, offers advanced risk modeling and innovative predictive analytics to improve health insurance underwriting.

5.      Milliman, and its subsidiary Milliman Solutions, exclusively license the Asserted Patents from Vigilytics in several fields, including health insurance underwriting, and practice them in connection with Milliman's proprietary Curv® platform.  The Milliman Curv® platform uses individual de-identified health information to generate more accurate group risk scores, allowing insurers to more precisely quote group insurance plans.

6.     Milliman recently discovered a Gradient proposal to a potential customer, G&A Partners, posted publicly online.  That proposal indicates that Gradient, despite having spun-off its platform from Milliman for use in the workers compensation industry, has introduced a health insurance underwriting risk modeling platform that directly competes with, and is siphoning customers away from, Milliman's Curv® platform.  Milliman's subsequent investigation revealed that Mr. Smith and Mr. Pettus surreptitiously amassed substantial proprietary, confidential, and trade secret information regarding Milliman's Curv® platform during their employment at Milliman, and that Mr. Smith, at least, misappropriated this information when he emailed himself copies upon leaving Milliman to ensure that it would be available to him at Gradient.  Upon information and belief, Gradient has developed its competing health insurance platform by leveraging Mr. Smith's and Mr. Pettus' knowledge of Curv®'s patented and trade secret components to gain a substantial head start on platform development, contracting, pricing and marketing strategies and an unfair advantage in the market for health insurance predictive analytics.

7.     By operating this competing service, Gradient willfully infringes the Asserted Patents in violation of the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*  Gradient, Mr. Smith, and Mr. Pettus also misappropriate Milliman's trade secrets related to the Curv® platform, in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.* and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), Mass. Gen. L. c. 93, §§ 42 *et seq.*, and engage in unfair and deceptive trade practices and unfair competition in violation of Sections 2 and 11 of Chapter 93A of the General Laws of the Commonwealth of Massachusetts.  Mr. Smith and Mr. Pettus likewise breach their contractual confidentiality obligations to their former employer, Milliman.

## PARTIES

8.      Plaintiff Milliman Inc. is a Delaware corporation with a principal place of business in Seattle, Washington.  Founded in 1947, Milliman is an established, leading international independent risk management, benefits and technology firm.  Milliman provides consulting and actuarial services, including data analysis, risk modeling and predictive analytics, to a wide spectrum of business, financial, government, union, education, and nonprofit organizations.  Its leading practice areas include insurance, including particularly health and life insurance.

9.      Plaintiff Milliman Solutions, LLC is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Brookfield, Wisconsin.  Milliman Solutions is a wholly-owned subsidiary of Milliman that offers software products and services for the health, property, casualty, and life insurance industries.

10.      Plaintiff Vigilytics LLC is a limited liability company organized under the laws of the State of New York with a principal place of business in Victor, NY.  Vigilytics is a healthcare analytics firm that owns multiple patents on its innovative technologies.

11.      Defendant Gradient A.I. Corp., formerly known as Arrowhead Technology Corp., is a Delaware corporation with its principal place of business at 321 Summer Street, 6th Floor, Boston, Massachusetts 02210.  Gradient is a consulting firm offering predictive analytics to certain sectors of the insurance industry.

12.      Stanford A. Smith is the founder and Chief Executive Officer of Gradient.  Upon information and belief, Mr. Smith resides in and primarily performs his executive functions as Gradient CEO in Massachusetts.  Mr. Smith was employed by Milliman from 2011 to 2018 as the head of Milliman's predictive analytics practice.

13.     Samuel Chase Pettus is Sales Director, Health at Gradient.  Upon information and belief, although Mr. Pettus resides in Arkansas, in the course of his work for Gradient, he regularly communicates with employees at Gradient's sole office in Boston, Massachusetts, and is directly supervised by Mr. Smith from Massachusetts.  Mr. Pettus was employed by Milliman from 2012 to 2018, initially as a business development manager in the health and welfare employee benefits practice of Milliman's Omaha, Nebraska office and subsequently as an employee of Milliman's predictive analytics practice led by Mr. Smith.

## JURISDICTION AND VENUE

14.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271 *et seq*., for trade secret misappropriation under the DTSA, 18 U.S.C. §§ 1836 *et seq*., and the MUTSA, Mass. Gen. L. c. 93, §§ 42 *et seq*., and for breach of contract.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), and 1367.

16.     This Court has general personal jurisdiction over Gradient because Gradient is headquartered in, and upon information and belief has its only office in, Boston, Massachusetts.

17.     This Court has general personal jurisdiction over Mr. Smith because he is domiciled in and works for Gradient in Massachusetts.

18.     This Court has at least specific personal jurisdiction over Mr. Pettus because he is employed by a company headquartered and operating almost entirely from Massachusetts, is supervised directly by Mr. Smith from Massachusetts, and regularly communicates with Mr. Smith and other Gradient employees in Massachusetts.  Upon information and belief, Mr. Pettus has conveyed Milliman trade secrets and confidential information to Gradient in Massachusetts,

through his communications to Mr. Smith and other Gradient employees while they were located in Massachusetts.

19.    Venue as to Gradient is proper in this district pursuant to 28 U.S.C. § 1391(b)-(c), because Gradient is subject to personal jurisdiction in, and so resides in, this district, and pursuant to 28 U.S.C. § 1400(b), because Gradient has its principal place of business in and has committed acts of patent infringement and trade secret misappropriation in this district.

20.    Venue as to Mr. Smith is proper in this district pursuant to 28 U.S.C. § 1391(b)-(c) because he is domiciled in, and so resides in, this district.

21.    Venue as to Mr. Pettus is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Mr. Pettus' breach of his confidentiality obligations to Milliman and his trade secret misappropriation occurred in this district, where Gradient primarily operates and where Mr. Smith is based.

## FACTUAL BACKGROUND

**A.    Risk Assessment in the Health Insurance Industry**

22.    Health insurance pools the financial risk of medical expenses among participants in the insured group.

23.    The effectiveness of such pooling and the long-term viability of a health insurance plan rely on an appropriate amount of funds being contributed to the plan by the insured group. The amount of funds needed depends on the demographics and particular health circumstances of the individuals comprising the insured group.

24.    The amount of funds available in a health insurance plan for payout on claims is determined, in turn, by what price a health insurer sets for the plan.

25.    To price health insurance coverage (in a process called medical underwriting), insurers have used increasingly complex predictive risk models that seek to estimate accurately

the medical and financial risks posed by the particular individual or group seeking a health insurance quote.

26.    Health insurance risk models for group insurance historically have used as inputs general demographic information provided by the group seeking insurance.  For instance, an employer seeking to offer health insurance to its employees may inform the insurer of the age of its employees.  The particular age breakdown of the employee pool, in turn, affects the insurer's assessment of that pool's health risk and informs the insurer's pricing quote.

27.    Ultimately, risk models, however sophisticated, are only as good as their inputs. Where the inputs consist of general demographic information, risk modeling depends on generic assumptions about the impact of various demographic characteristics on health outcomes.  Such modeling is not tailored in a meaningful way to the specific health circumstances and risk profiles of the individuals in the pool.

28.    Risk models that include as inputs specific health circumstances of those in the insured pool consistently have greater predictive power, allowing for more accurate pricing.  But such tailored modeling has long been unavailable in many group insurance contexts because of the protected status of individuals' health information.

29.    Federal privacy laws, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), mandate that hospitals, doctors' offices, pharmacies, healthcare facilities, and other covered entities cannot disclose an individual's Protected Health Information ("PHI"), *i.e.* personally-identifying health information, including information regarding health status or medical treatments, unless that individual provides express written consent.

30.    As a result, health insurers desiring to use information regarding specific health

circumstances of those seeking insurance in their risk model must ask insurance applicants to provide their written consent for disclosure of their PHI.

31.     Health insurance companies frequently found it inefficient, impractical, and cost prohibitive to seek such individualized consent from all group members when quoting group insurance.  As a result, health insurers made do with suboptimal risk models for group insurance, passing on the burden of unknown risk to customers through health insurance premiums that might be either higher or lower than optimal.

32.     Prior to the inventions claimed in the Asserted Patents, computer systems had limited technical effectiveness in evaluating health insurance group risk without using the PHI of individuals in the group, which was accessible only by obtaining written consent from individuals in the group.

33.     Vigilytics' founder and president, Andrew L. Paris, III, invented a system, with innovative computerized encryption and identification techniques, to address this informational gap, providing health insurers with a means to efficiently access health information for group plan underwriting without requiring individual written consent and without implicating privacy laws.

**B.    The Asserted Patents**

34.     Mr. Paris is the named inventor of the Asserted Patents, which describe computerized techniques for de-identifying PHI in a manner that, without implicating patient privacy, allows the transmission of medical information among entities that possess PHI (such as a hospital that rendered treatment to a patient) and entities that seek medical information to improve their processes (such as insurers seeking to more accurately quote health coverage for a group of which that patient is a member).

35.     On August 25, 2015, the USPTO issued the '641 Patent, titled "De-Identifying Medical History Information For Medical Underwriting."  A true and correct copy of the '641 Patent is attached as Exhibit 1.

36.     On April 26, 2016, the USPTO issued the '892 Patent, titled "Using De-Identified Healthcare Data To Evaluate Post-Healthcare Facility Encounter Treatment Outcomes."  A true and correct copy of the '892 Patent is attached as Exhibit 2.

37.     On May 30, 2017, the USPTO issued the '685 Patent, titled "Using De-Identified Healthcare Data To Evaluate Post-Healthcare Facility Encounter Treatment Outcomes," a continuation of the '892 Patent.  A true and correct copy of the '685 Patent is attached as Exhibit 3.

38.     On May 8, 2018, the USPTO issued the '651 Patent, titled "Using De-Identified Healthcare Data To Evaluate Post-Healthcare Facility Encounter Treatment Outcomes," a continuation of the '685 Patent.  A true and correct copy of the '651 Patent is attached as Exhibit 4.

39.     On October 23, 2018, the USPTO issued the '375 Patent, titled "De-Identifying Medical History Information for Medical Underwriting."  A true and correct copy of the '375 Patent is attached as Exhibit 5.

40.     On May 30, 2017, the USPTO issued the '012 Patent, titled "De-Identifying Medical History Information for Medical Underwriting," a continuation of the '375 Patent.  A true and correct copy of the '012 Patent is attached as Exhibit 6.

41.     Vigilytics is the owner and assignee of all right, title, and interest in and to the Asserted Patents.

42.     The Asserted Patents generally describe inventions for computerized techniques

9

for de-identifying PHI. In particular, the Asserted Patents describe a computing system that assigns encrypted request tokens to multiple individuals that are part of a given group, matches those request tokens against tokens assigned to users' de-identified PHI, and then provides to the requestor reports on characteristics of the group based on the aggregated, de-identified health information matching the request tokens, all without needing the authorization of the individuals at issue for processing their PHI.

43.     The inventions of the Asserted Patents use the same token generator, or other means to generate identical tokens, to generate the request tokens as well as the tokens for the individuals' de-identified PHI. *See, e.g.*, Ex. 5, '375 Patent, at col. 5:51-55. In some implementations, in order to preserve the privacy of the individuals, the token generator determines whether a minimum number of individuals are included in a request message before generating the request tokens. *See, e.g.*, *id.* at col. 7:11-22. A token matcher can then find all tokens in the token set for de-identified individual PHI that match the request tokens for the specific individuals in the group for which a request was made. *See, e.g.*, *id.* at col. 6:4-7. In some implementations, in order to preserve the privacy of the individuals, the token matcher determines whether a minimum number of matches has been detected before continuing to process the individuals' de-identified PHI. *See, e.g.*, *id.* at col. 7:52-60.

44.     The inventions claimed in the Asserted Patents, including the claims quoted in the following paragraphs, improve prior art computer systems for transmitting PHI through their technical, computer-driven solution involving the matching of the encrypted tokens.

45.     For example, claim 7 of the '641 Patent claims:

A system comprising:

an encryption server, having a processor and a memory, for producing a token for each individual included in a group composed of multiple individuals identified in

a request for healthcare information that characterizes the group, wherein the identity of the individuals in the group is unattainable from the tokens, each token being associated with a corresponding token in a set of de-identified healthcare data, and each token in the set of de-identified healthcare data being associated with healthcare data for a corresponding individual;

a data server for producing the requested healthcare information that characterizes the group by identifying the tokens in the set of de-identified healthcare data and the associated de-identified healthcare data that correspond to the produced tokens, wherein the produced tokens and the tokens in the set of de-identified data are similarly encrypted, and the produced healthcare information is absent personally identifiable information and has been produced without the individuals in the group having authorized production of such healthcare information that characterizes the group; and

providing the produced healthcare information to report the characteristics of the group composed of multiple individuals absent authorization at any time from the individuals in the group of individuals to provide the requested healthcare information.

46.    For example, claim 7 of the '375 Patent claims:

A system comprising:

a data server device for producing healthcare information that characterizes a group of a number of individuals identified in a request for the healthcare information that characterizes the group, wherein the request for healthcare information is sent to an encryption server that is configured to determine if the number of individuals in the request is at least a defined minimum number of individuals, wherein a unique request token is produced for each individual included in the group, the data server is configured to compare the request tokens to tokens associated with healthcare data that includes de-identified information to find matching tokens, the produced healthcare information is absent personally identifiable information and is based on a minimum number of matched tokens, the data server is also configured to provide the produced healthcare information to report the characteristics of the group absent authorization from the individuals in the group.

47.    For example, claim 7 of the '012 Patent claims:

A system comprising:

a user computing device that produces an encrypted request message for healthcare information that characterizes a group composed of multiple individuals, the encrypted request message including a unique token produced by the user device for each individual included in the group, wherein the user computing device is configured to send the encrypted request message to a server to produce the healthcare information, the server is configured to compare the unique request

tokens to unique tokens associated with healthcare data to find matching tokens, the unique tokens associated with healthcare data are absent identities of individuals, the healthcare information being produced based on a minimum number of matched tokens and the identity of the individuals being unattainable from the produced healthcare information, wherein the user computing device is further configured to receive the produced healthcare information to report the characteristics of the group absent authorization from the individuals in the group.

48.     For example, claim 11 of the '892 Patent claims:

A system comprising:

a hardware encryption server for producing a token for each individual included in a group composed of multiple individuals identified in a request received from a user device for medical information that characterizes the group absent authorization from the group of individuals wherein the identity of the individuals in the group is unattainable from the tokens; and

a data server for producing the requested medical information that characterizes the group from a set of de-identified medical data representing pre or post-encounter characteristics of the individuals by identifying tokens in the set of de-identified medical data and the associated de-identified medical data that correspond to the produced tokens, wherein an identity of each of the individuals is unattainable from the produced medical information, and the data server is configured to provide the produced medical information to report characteristics of the group of individuals absent authorization from individuals in the group of individuals.

49.     For example, claim 7 of the '685 Patent claims:

A system comprising: a computing device comprising:

a memory configured to store instructions; and

a processor to execute the instructions to perform operations comprising:

receiving a request from a user device for medical information that characterizes a group composed of multiple individuals from a set of de-identified medical data representing pre- or post-encounter characteristics of the individuals, wherein the request contains identifying data for each member in the group of multiple individuals; producing a request token for each individual included in the group of individuals;

comparing the request tokens to tokens associated with the de-identified medical data to find matching tokens;

producing the requested medical information with the identity of the

individuals being unattainable from the produced medical information without the individuals in the group having authorized production of such medical information that characterizes the group; and

providing the produced medical information to report the characteristics of the group of individuals absent authorization from the individuals in the group of individuals identified in the request containing identifying data.

50.    For example, claim 7 of the '651 Patent claims:

A system comprising: a computing device comprising:

a memory configured to store instructions; and

a processor to execute the instructions to perform operations comprising:

receiving a request from a user device for information that characterizes a group composed of multiple individuals from a set of de-identified data representing characteristics of the individuals pre- or post-encounter with a healthcare facility, wherein the request contains identifying data for each member in the group of multiple individuals who have had an encounter with a healthcare facility;

producing, by a hardware processor, a request token for each individual included in the group of individuals;

comparing the request tokens to tokens associated with the medical data to find matching tokens and to determine whether the group includes at least a minimum number of individuals to be included in a report in response to the request wherein the minimum number of individuals are selected according to at least a privacy-preserving rule that disallows same individuals to be included within a defined period of time;

producing the requested information that characterizes the group, an identity of the individuals being unattainable from the produced information; and

providing the produced medical information to report the characteristics of the group of individuals absent authorization from the individuals in the group of individuals identified in the request containing identifying data.

51.    The inventions of the Asserted Patents address technological problems and provide technological solutions that were not well-understood, routine, or conventional at the time of the invention.  A person of ordinary skill in the art reading the Asserted Patents and their

claims would understand that (a) the Asserted Patents' disclosures and claims are drawn to solving specific, technical problems and (b) the claimed subject matter represents an advancement in the technical field of the Asserted Patents.  For example, as to both (a) and (b), the determination, by the token generator, that a minimum number of individuals are included in a request message before generating the request tokens contributes to solving the technical problem of securing private information of the individual members when processing and retrieving healthcare data.  Similarly, the determination, by the token matcher, that a minimum number of matches has been detected before continuing to process the individuals' de-identified PHI further contributes to solving this technical problem.  *See, e.g.,* Ex. 5, '375 Patent, at col. 7:11-22, 7:52-60.

52.     The claims do not preempt all techniques for or approaches to accomplishing the same or a similar end to what they recite.  For example, the claims do not preempt the use of the techniques taught in the prior art cited on the face of the Asserted Patents, none of which, as the patent examiners found, disclose or render obvious the claimed inventions, further showing that the claims are not well-understood, routine, or conventional.

53.     The claims of the Asserted Patents do not merely recite the performance of some business practice known from the pre-computer world along with the requirement to perform it on a computer.  Instead, the Asserted Patents recite one or more inventive concepts that are rooted in computerized technology, and overcome technical problems specifically arising in that realm.  Specifically, the Asserted Patents address and provide a solution to a long-standing problem in the area of retrieving de-identified healthcare data for a known group of individuals. As the Asserted Patents explain, while technological systems for storing and accessing PHI existed, absent the inventions' techniques for retrieving de-identified healthcare data, "[f]ederal

privacy laws … make obtaining th[e medical] information [at issue] a cumbersome process which would add considerable expense to operations."  Ex. 2, '892 Patent, at col. 1:33-47; Ex. 3, '685 Patent, at col. 1:51-54; Ex. 4, '651 Patent, at col. 1:52-55.  Without access to that information, "companies that offer health insurance to small and midsize groups … are often unable to obtain the health history data they need to estimate the risk of insuring such groups … This frequently leads to less than optimal pricing for the companies, the groups, or both."  Ex. 5, '375 Patent, at col. 1:19-25; Ex. 6, '012 Patent, at col. 1:21-27.

54.    With the healthcare data retrieval system claimed in the Asserted Patents, insurers need not undertake the cumbersome process of obtaining individual consents, thereby avoiding the attendant expense, but still can obtain the necessary medical information to more accurately quote group insurance, optimizing pricing.  A person of ordinary skill in the art would thus understand that the claims of the Asserted Patents are directed to specific improvements in computerized systems and techniques for retrieving healthcare data more efficiently and inexpensively while still complying with privacy laws so that PHI of individuals remains secure and private.  Accordingly, each claim of the Asserted Patents recites a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept.

55.    The inventions claimed in the Asserted Patents do not pre-empt all methods for retrieving PHI.  For example, computers can retrieve PHI without retrieving de-identified healthcare data for a known group of individuals using the retrieval system and techniques set forth in the claims of the Asserted Patents.

## C.    Milliman IntelliScript Curv®

56.    Milliman Solutions and its affiliates, including its parent company Milliman, are

the exclusive licensees of the Asserted Patents in several fields, including health insurance and life insurance underwriting. Milliman and Milliman Solutions have the exclusive right worldwide to practice, use and commercialize the Asserted Patents in the field of, *inter alia*, health insurance underwriting.

57.    Milliman's IntelliScript business unit offers cutting-edge risk management services for the health and life insurance industries, including its proprietary Curv® service ("Curv").

58.    Curv is a market leading, predictive modeling engine that assigns robust risk scores to groups based on the de-identified health information of individuals in that group. Insurers use Curv's risk scores to quote group insurance more accurately and efficiently.

59.    Milliman's insurer customers submit to Curv census data identifying the members of a group. Milliman then practices the Asserted Patents through its Curv platform to match that census data with de-identified health information for the individuals and uses de-identified healthcare data (from the information) as an input to its risk models. Milliman's use of de-identified health data provides insurers with more accurate risk scores without requiring them to obtain HIPAA authorization or otherwise implicate individuals' PHI.

60.    Milliman's Curv business also employs numerous Milliman-developed and Milliman-owned trade secrets, including methods for importing and processing insurer accounts on the Curv platform, the formulas and analyses involved in assigning and calibrating Curv's group risk scores, pricing, and sales and marketing methodologies for Curv, including the methods by which Milliman conducts proof of concept studies and bidding simulations (collectively, "Trade Secrets"). Such trade secrets are reflected in, *inter alia*, (i) calibration study spreadsheets (generated by IntelliScript and shared internally with a sales team but not with the

client) that show a detailed analysis of a Curv client's book of business with group level demographic risk scores, Curv risk scores, and the calculations required to normalize and integrate the Curv risk score into a Curv client's health rating manual ("Calibration Studies"); (ii) sales presentations (given to prospective Curv clients only after they sign a non-disclosure agreement) that explain how Curv operates, walk customers through a bidding simulation, and provide data from that simulation and other proof of concept studies ("Sales Presentations"); and (iii) IntelliScript's standard services agreement for Curv (shown to prospective clients only after they sign a non-disclosure agreement), which sets forth, among other things, pricing, client deliverables, pilot parameters, key terminology, and service-level commitments ("Curv Services Agreement").

61.     Milliman's Trade Secrets involved in processing and assigning group risk scores are a key component of the Curv platform, allowing Curv to consistently outperform traditional underwriting. Milliman's sales and marketing Trade Secrets, including particularly its methodologies for proof of concept studies and bidding simulations, allow Milliman to effectively communicate very complex information and to concretely demonstrate the value Curv offers, even where prospective customers may not have sufficient data to enable individualized proofs of concept. As a result, the Trade Secrets are critical to Milliman's advertising of Curv and track record for obtaining new customers.

62.     Since 2009, when it began work on the Curv platform, Milliman has invested substantially in developing and refining the trade secret aspects of its Curv business, including spending over two years and $2 million to launch the platform and land its first customer. Over the course of the next decade, Curv developed into a business that now brings in tens of millions of dollars annually.

63.     Milliman goes to substantial lengths to protect the secrecy of its Trade Secrets, including by (i) requiring all employees to sign confidentiality agreements upon commencement of their employment, (ii) publicly offering only very limited, high-level marketing and advertising material for Curv that conveys solely the offering's general value proposition, (iii) requiring every prospective and existing customer of Curv to sign a non-disclosure agreement in order to access any more detailed or specific information regarding Curv, (iv) marking all such materials shown to customers as proprietary and confidential, and (v) implementing technological protections on the Curv platform itself, such as limiting access to authorized users, including through user-name and password restrictions, limiting what aspects of the platform even authorized customer users can access and view, and conducting regular vulnerability scans and penetration tests.  As a result, the Trade Secrets embodied in the Curv business are not generally known in the industry.

64.     The Trade Secrets have substantial value, as reflected by the fact that Milliman's Curv has been a market-leading offering since it was first used by customers in 2011.

**D.     Stan Smith's Employment at Milliman and Exposure to Curv**

65.     Prior to founding Gradient, Mr. Smith was an employee of Milliman for over six years.

66.     Prior to joining Mr. Smith at Gradient, Mr. Pettus was an employee of Milliman for over five years.

67.     At the start of Mr. Smith's employment with Milliman in 2011, Mr. Smith and Milliman executed an Employee Trade Secret and Client Information Agreement ("Confidentiality Agreement").  Likewise, at the start of Mr. Pettus' employment with Milliman in 2012, Mr. Pettus and Milliman executed a Confidentiality Agreement.  True and correct

copies of the Confidentiality Agreements are attached as Exhibit 7.

68.     In the Confidentiality Agreements, Mr. Smith and Mr. Pettus each acknowledged that in the course of his employment, he would "work with, have access to or be entrusted with" Milliman-owned confidential, trade secret information, including "data bases and compilations, computer software programs, client information, guidelines, studies, [and] projection models (the 'Confidential Information')."

69.     The Confidentiality Agreements required Mr. Smith and Mr. Pettus "to keep the Confidential Information strictly confidential and to treat it as confidential information and/or a trade secret," and expressly prohibited Mr. Smith and Mr. Pettus from "us[ing] the Confidential Information except as necessary to provide services to clients of Milliman within the scope of [his] employment."

70.     Specifically, Mr. Smith and Mr. Pettus each agreed that "[e]xcept as necessary for [him] to perform his … employment duties for Milliman, [he would] not, directly or indirectly, copy, use or disclose any Confidential Information, either during *or subsequent to* [his] employment with Milliman" (emphasis added).

71.     Mr. Smith, over the course of his employment at Milliman from 2011 to 2018, led Milliman's predictive analytics practice.  In his capacity as a practice group leader, Mr. Smith received extensive access to Milliman's Confidential Information, as defined by the Confidentiality Agreement.  In connection with supervising joint work his predictive analytics practice undertook with IntelliScript's Curv team on opportunities, prospective customers, and shared accounts, Mr. Smith became aware of how Intelliscript's Curv operated, including its use of a patented retrieval process that retrieves de-identified healthcare data for a known group of individuals and the value Curv offered to customers.  Mr. Smith also specifically received access

to Curv-related Trade Secrets, including pricing information and copies of Calibration Studies and Curv Services Agreements.

72.    Mr. Pettus began his employment with Milliman in 2012 as a business development manager in the health and welfare employee benefits practice of Milliman's Omaha, Nebraska office.  As a business development manager, Mr. Pettus worked closely with the Milliman Intelliscript's Curv team to offer Curv to customers whose accounts Mr. Pettus managed.  In the course of that work, the Curv team shared extensive Trade Secrets and other confidential information about Curv with Mr. Pettus, including providing Calibration Studies and pricing for customers and access to Sales Presentations for Curv.  Upon information and belief, Mr. Pettus also gained knowledge of the Asserted Patents.

73.    Following Mr. Pettus' transition to Mr. Smith's predictive analytics practice within Milliman, Mr. Pettus and his new colleagues, predictive modelers in that practice, worked closely with the Curv team to service a client shared by Intelliscript and the predictive analytics practice.  As part of that work, the Curv team again shared Trade Secrets and other confidential information about Curv with the predictive analytics team, including sending the Calibration Study and the Curv Services Agreement for the shared client to Mr. Pettus and his new teammates.  Mr. Pettus, in turn, shared with Mr. Smith the confidential and Trade Secret information he received, including the Calibration Study and the Curv Services Agreement.

74.    As Milliman learned in its recent review of Mr. Smith's Milliman emails, Mr. Smith and Mr. Pettus also sought and obtained additional information regarding Curv and its business model not readily available to them in the ordinary course of their job functions at Milliman.  In April 2017, for instance, Mr. Pettus encouraged Mr. Smith to "get one of your smart math people to walk thru the results [of a Curv risk score] with you guys under the premise

that you need to understand it inside and out to be able to communicate to the end client and help sell [the end client] on the value of working with [Curv] on a go forward basis!!! :).”  The following month, two members of Stan Smith's practice, including a predictive modeler, in fact did secure a meeting with members of the Curv team, who explained the details of the Curv calibration process reflected in Calibration Studies.  And in September 2017, Mr. Smith sent to Mr. Pettus a chart of Intelliscript's engagements with a particular client, including an engagement for Curv, which reflected expected annual and cumulative values and invoiced and paid amounts year-to-date.  Mr. Pettus responded by repeatedly asking where Mr. Smith obtained the reflected information.  Mr. Smith declined to answer, jokingly indicating he "[a]sked Bill Bellicheck [*sic*] for it."

**E.     Stan Smith's Departure from Milliman and Founding of Gradient**

75.     While at Milliman, Mr. Smith led a team, separate from Milliman's Intelliscript business unit and the Curv® platform, that created a predictive analytics platform called "gradient A.I."

76.     The gradient A.I. platform was specifically targeted at providing a solution for managing workers' compensation risk to professional employer organizations, outsourcing firms that provide HR, payroll, benefits and other services for small-to-medium sized companies.  The gradient A.I. platform was not used in the field of health insurance.

77.     In 2018, Milliman and Mr. Smith agreed that Mr. Smith would acquire the gradient A.I. business from Milliman and spin it out into a separate company operating in the workers compensation field.  Mr. Smith became, and remains, the founder and CEO of that new company, initially called Arrowhead Technology Corp. and later renamed Gradient A.I. Corp.

78.     As part of the spin-off, in addition to Mr. Smith, ten other Milliman employees,

all of whom worked directly on the gradient A.I. platform, left Milliman and became Gradient employees.  Mr. Pettus was one of these employees, and took on a sales executive role at Gradient.  Gradient has recently promoted Mr. Pettus to Sales Director, Health.

79.    Milliman recently discovered that in connection with the departure of Mr. Smith's team from Milliman, in late June and early July 2018, Mr. Smith forwarded to himself at his new Gradient AI email address and his personal Gmail email address a series of emails containing protected Milliman information and data.  Among other things, Mr. Smith emailed to both his Gradient AI and Gmail accounts a Curv Calibration Study, thereby ensuring his continued access to written documentation reflecting Milliman's Trade Secrets in Curv after his separation from Milliman.

**F.    Gradient's Infringing "Group Risk Score"**

80.    After Gradient spun off from Milliman to operate in the workers compensation space, Gradient began offering a predictive analytics platform for health insurance underwriting.

81.    As revealed by Milliman's recent review of Mr. Smith's emails, several months before the spin-off, while the gradient A.I. platform was still a Milliman offering, Mr. Pettus suggested to Mr. Smith that before departing Milliman, the predictive analytics practice should make the "integration" of their platform with Curv's predictive analytics for health insurance underwriting "one of the priorities," particularly as one customer had already requested such integration.  Mr. Pettus observed, "My thinking is if we do not, then after we're out, it might not ever be a possibility for us to do.  [Milliman] simply might not allow it – for numerous reasons. That would be pretty bad for us for lots of reasons."  Mr. Pettus' proposed "integration" was not completed before Gradient's spin-off, so instead Gradient sought to offer a competing health insurance underwriting platform to complement its workers compensation offering using

22

Milliman's intellectual property.

82.    By 2020, Gradient was competing with Milliman for the business of G&A Partners, a leading professional employer organization, including predictive analytics underwriting platforms for both workers compensation and health insurance.

83.    Milliman became aware of this when it reviewed a Response to Request for Proposal that Gradient submitted to G&A Partners ("G&A Response").  A true and correct copy of the G&A Response is attached as Exhibit 8.

84.    For a period of time, including at least from December 18, 2020 to February 18, 2021, the G&A Response was posted on and publicly available through the website of Gradient's business partner, Cure Technologies LLC ("Cure"), at https://curetechnologies.us/wp-content/uploads/2020/08/GA-Partners-Underwriting-Services-RFP-1.pdf.  There were no restrictions or limitations placed on the public viewing or download of the G&A Response.

85.    In the G&A Response, Gradient offered to G&A, as part of its medical underwriting services, a "Group Risk Score," in which it "uses de-identified prescription, clinical, lab and/or medical claim histories to provide a predictive risk score for the member group."  Ex. 8 at 13.

86.    The "Group Risk Score" service requires the customer to provide to Gradient "a census, which will include for each individual:" a "synthetic group identifier," the individual's first name and last name, gender, date of birth, and zip code, and their "designation as Subscriber or dependent."  Gradient then "uses de-identified prescription, clinical, lab and/or medical claim histories to provide[s] the group's predictive risk score" to the customer.  *Id.*

87.    Upon information and belief, by performing this "Group Risk Score" service, Gradient makes, uses, sells, offers to sell, and/or induces others to use at least the systems claims

of the Asserted Patents.

88.    Taking claim 7 of the '641 Patent as exemplary, upon information and belief, a computer system that implements Gradient's "Group Risk Score" service possesses the first element of the claim by utilizing an encryption server to produce tokens for each individual included in a group for which a risk score is being computed.  The produced tokens correspond to tokens associated with "de-identified prescription, clinical, lab and/or medical claim histories" of the individuals in the group.  *Id*.  The individuals in that group are identified by the Gradient customer, who submits a request to Gradient's system for a "Group Risk Score."  The request may comprise a census that includes for each individual in the group information such as first and last name, gender, date of birth, and/or zip code.

89.    Upon information and belief, the computer system that implements Gradient's "Group Risk Score" service possesses the second element of claim 7 of the '641 Patent by utilizing a data server, *i.e.* a computer system with a back-end component, to match the tokens produced by the encryption server with tokens associated with de-identified medical data and then generate the requested medical information, *i.e.* "the de-identified prescription, clinical, lab and/or medical claim histories" for individual members of the group used to create "the group's predictive risk score."  *Id*.

90.    The identity of the individuals remains unattainable throughout from either the tokens or the medical information because the "Group Risk Score" system processes only de-identified health information and aggregates the health information from multiple individuals.

91.    To generate the requested medical information and determine the "Group Risk Score," Gradient does not seek authorization from the individuals to produce or provide the medical information that characterizes the group at either step.

92.     Taking claim 11 of the '892 Patent as exemplary, upon information and belief, a computer system that implements Gradient's "Group Risk Score" service possesses the first element of the claim by utilizing a hardware encryption server to produce tokens for each individual included in a group for which a risk score is being computed.  The produced tokens correspond to tokens associated with "de-identified prescription, clinical, lab and/or medical claim histories" of the individuals in the group.  *Id.*  The individuals in that group are identified by the Gradient customer, who submits a request to Gradient's system for a "Group Risk Score." The request may comprise a census that includes for each individual in the group information such as first and last name, gender, date of birth, and/or zip code.

93.     Upon information and belief, the computer system that implements Gradient's "Group Risk Score" service possesses the second element of claim 11 of the '892 Patent by utilizing a data server, *i.e.* a computer system with a back-end component, to match the tokens produced by the hardware encryption server with tokens associated with de-identified medical data and then generate the requested medical information, *i.e.* "the de-identified prescription, clinical, lab and/or medical claim histories" for individual members of the group used to create "the group's predictive risk score."  *Id.*

94.     The identity of the individuals remains unattainable throughout from either the tokens or the medical information because the "Group Risk Score" system processes only de-identified health information and aggregates the health information from multiple individuals.

95.     To generate the requested medical information and determine the "Group Risk Score," Gradient does not seek authorization from the individuals to produce or provide the medical information that characterizes the group at either step.

96.     Taking claim 7 of the '685 Patent as exemplary, upon information and belief, a

computer system that implements Gradient's "Group Risk Score" service includes a memory configured to store instructions and a processor to execute the instructions to perform operations.

97.     Upon information and belief, a computer system that implements Gradient's "Group Risk Score" service performs the first operation recited in the claim by receiving a request from the Gradient customer for a "Group Risk Score," which characterizes de-identified medical data for a group composed of multiple individuals, *i.e.* "de-identified prescription, clinical, lab and/or medical claim histories," which Gradient uses "to provide a predictive risk score for the member group." *Id.*  Upon information and belief, the request is received from the Gradient customer's user device and contains identifying data for each member in the group such as first and last name, gender, date of birth, and/or zip code.

98.     Upon information and belief, the computer system that implements Gradient's "Group Risk Score" service performs the second and third operations recited in claim 7 of the '685 Patent by producing a request token for each individual in the group, *e.g.*, by utilizing a hardware data server, and matching the request tokens with corresponding tokens associated with "de-identified prescription, clinical, lab and/or medical claim histories."

99.     Upon information and belief, the computer system that implements Gradient's "Group Risk Score" service performs the fourth and fifth operations recited in claim 7 of the '685 Patent by producing and providing the requested medical information, *i.e.* the "de-identified prescription, clinical, lab and/or medical claim histories" for individual members of the group, which Gradient uses "to provide a predictive risk score for the member group." *Id.*  Upon information and belief, Gradient does not seek authorization from the individuals to provide the produced medical information, and the identity of the individuals remains unattainable from the produced medical information because the "Group Risk Score" system processes only de-

identified health information and aggregates the health information from multiple individuals.

100.    Taking claim 7 of the '651 Patent as exemplary, upon information and belief, a computer system that implements Gradient's "Group Risk Score" service includes a memory configured to store instructions and a processor to execute the instructions to perform operations.

101.    Upon information and belief, a computer system that implements Gradient's "Group Risk Score" service performs the first operation recited in the claim by receiving a request from the Gradient customer for a "Group Risk Score," which characterizes de-identified medical data for a group composed of multiple individuals, *i.e.* "de-identified prescription, clinical, lab and/or medical claim histories," which Gradient uses "to provide a predictive risk score for the member group." *Id.* The request is received from the Gradient customer's user device and contains identifying data for each member in the group such as first and last name, gender, date of birth, and/or zip code.

102.    Upon information and belief, the computer system that implements Gradient's "Group Risk Score" service performs the second and third operations recited in claim 7 of the '651 Patent by utilizing a hardware processer to produce a request token for each individual in the group, and comparing the request tokens with corresponding tokens associated with the "de-identified prescription, clinical, lab and/or medical claim histories." Upon information and belief, the computer system matches the request tokens to the corresponding tokens and determines whether the group includes at least a minimum number of individuals to ensure that the reported "group's predictive risk score" is HIPAA compliant. Moreover, upon information and belief, the minimum number of individuals is selected according to a privacy-preserving rule that disallows the same individuals to be included within a defined period of time. If this were not the case, the identity of individuals would be easily attainable from repeated "Group Risk

Score" requests received from the Gradient customer, and Gradient's "Group Risk Score" service would not be HIPAA-compliant.

103.    Upon information and belief, the computer system that implements Gradient's "Group Risk Score" service performs the fourth and fifth operations recited in claim 7 of the '651 Patent by producing and providing the requested medical information, *i.e.* the "de-identified prescription, clinical, lab and/or medical claim histories" for individual members of the group, which Gradient uses "to provide a predictive risk score for the member group." *Id.* Upon information and belief, Gradient does not seek authorization from the individuals to report the produced medical information, and the identity of the individuals remains unattainable from the produced medical information because the "Group Risk Score" system processes only de-identified health information and aggregates the health information from at least a minimum number of individuals.

104.    Taking claim 7 of the '375 Patent as exemplary, upon information and belief, a computer system that implements Gradient's "Group Risk Score" service possesses the claimed data server by utilizing a data server, *i.e.* a computer system with a back-end component, to produce requested healthcare information that characterizes a group, *i.e.* "de-identified prescription, clinical, lab and/or medical claim histories," which Gradient uses "to provide a predictive risk score for the member group." *Id.* Upon information and belief, the individuals in the group are identified by the Gradient customer, who submits a request to Gradient's system for a "Group Risk Score." The request may comprise a census that includes for each individual in the group information such as first and last name, gender, date of birth, and/or zip code.

105.    Upon information and belief, the request is sent to an encryption server that determines if the number of individuals in the request is at least a defined minimum number of

individuals and produces a unique request token for each individual in the group.

106.    Upon information and belief, the data server utilized to implement Gradient's "Group Risk Score" compares the produced request tokens to tokens associated with the set of "de-identified prescription, clinical, lab and/or medical claim histories" to find matching tokens, and utilizes the de-identified information associated with the matched tokens to produce "the group's predictive risk score." *Id.* Upon information and belief, the data server then provides the "de-identified prescription, clinical, lab and/or medical claim histories" for individual members of the group, which Gradient uses "to provide a predictive risk score for the member group" that is absent personally identifiable information. *Id.* Moreover, upon information and belief, Gradient does not seek authorization from the individuals in the group to report the "Group Risk Score" to the Gradient customer.

107.    Taking claim 7 of the '012 Patent as exemplary, upon information and belief, Gradient makes, uses and/or induces its customers to use the claimed system that implements Gradient's "Group Risk Score" with instructions on how to use it in a manner such that Gradient's customers are beneficial users of Gradient's system within the United States. Gradient and/or the Gradient customer following the instructions provided by Gradient utilize a user computing device to produce an encrypted request message for healthcare information, *i.e.* "de-identified prescription, clinical, lab and/or medical claim histories" for individual members of a group, which Gradient uses "to provide a predictive risk score for the member group," *i.e.* a "Group Risk Score." *Id.* The request message includes a unique token produced by the user device for each individual in the group. Gradient and/or the Gradient customer send the request message from the user computing device to a server, *i.e.* a computer system with a back-end component.

108.    Upon information and belief, the server compares the unique request tokens to unique tokens associated with "de-identified prescription, clinical, lab and/or medical claim histories" for individual members of the group, and produces the requested "Group Risk Score." *Id.* The produced healthcare information, *i.e.* the "de-identified prescription, clinical, lab and/or medical claim histories" for individual members of the group, is used by Gradient "to provide a predictive risk score for the member group," which, upon information and belief, is based on a minimum number of matched tokens to ensure HIPAA compliance, and that the identity of the individuals is unattainable from the produced healthcare information.  The identity of the individuals remains unattainable from the produced healthcare information because the "Group Risk Score" system processes only de-identified health information and aggregates the health information from a minimum number of individuals.  The "Group Risk Score" is ultimately provided by the server and received by Gradient's and/or the Gradient customer's user computing device.

109.    Gradient's "Group Risk Score" service competes directly with Milliman's Curv, and was developed by Gradient soon after its spin-off from Milliman.

110.    In addition to infringing the Asserted Patents, upon information and belief, Gradient also used Milliman's Trade Secrets and Confidential Information, disclosed to Gradient by Mr. Smith and Mr. Pettus in violation of their confidentiality obligations to Milliman, to gain a substantial head start in the development, pricing, and marketing of and contracting for its "Group Risk Score" service.  Gradient was able to reach the market significantly sooner and has had substantially greater success obtaining customers as a small start-up than it would have had it developed the service, its pricing, and its marketing approach without the benefit of Milliman's protected information.  Gradient has, in turn, leveraged that head start and early traction in the

market to raise substantial funding from investors, including a recent $20 million Series B financing.

111.    In the G&A Response, Gradient reported already having "3 PEO [professional employer organization] customers on [its] health predictive underwriting platform."  Ex. 8 at 5. Upon information and belief, Gradient has since added more "Group Risk Score" customers and is continuing to advertise and offer its "Group Risk Score" service to prospective customers.

112.    Due to Gradient's infringement of the Asserted Patents and misappropriation of Milliman's Trade Secrets, and Mr. Smith's and Mr. Pettus' unlawful disclosure of Milliman's Confidential Information, including Trade Secrets, to Gradient, Milliman has lost its substantial advantage in the market as the exclusive licensee of the Asserted Patents and purveyor of the market-leading proprietary Curv platform.

113.    As a result, Milliman has begun to lose both existing and prospective business to Gradient, with three existing customers and two prospective customers lost to date.  Those losses amount to over $500,000 in the first year alone and would be at least as large or larger in subsequent years, because Curv account revenue typically grows, or at least stays the same, year over year.  Milliman and Gradient are continuing to compete for specific customers and Milliman expects losses of its existing and prospective business to continue unless Defendants are enjoined from continuing their unlawful activity.

114.    Gradient's unlawful competition with Milliman is also causing the erosion of Milliman's Curv pricing.  Gradient, through its unlawfully acquired knowledge of Milliman's proprietary pricing strategy, has been able to underbid Milliman, repeatedly offering pricing to Milliman's existing customers of about 70% of what Milliman charges.  Consequently, to keep those existing customers, Milliman has been forced to agree to lower fees, and has suffered a

substantial revenue decrease as a result.  Milliman expects this downward pricing pressure and revenue erosion to continue unless Defendants are enjoined from continuing their unlawful activity.

**G.    Gradient and Mr. Smith Refuse to Engage with Milliman Regarding Milliman's Concerns**

115.    In early 2021, upon becoming aware of the G&A Response, which was posted and publicly available online and reflected that Gradient was offering a "Group Risk Score" service, Milliman contacted Gradient and Mr. Smith to object to their unlawful activity.

116.    By way of a phone call on February 4, 2021, a follow-up written communication on February 8, 2021, and several subsequent communications, Milliman expressed its concern to Mr. Smith directly regarding Gradient's and Mr. Smith's activities.  Milliman specifically identified the Asserted Patents by number and voiced its concern that Gradient's "Group Risk Score" infringed the Asserted Patents and was the result of Gradient's and Mr. Smith's misappropriation of Milliman's Trade Secrets and Confidential Information.  Milliman likewise reminded Mr. Smith of his and other Gradient employees' confidentiality obligations under the Confidentiality Agreement.

117.    In response to these communications, Gradient and Mr. Smith, baldly and without support, have denied infringing or misappropriating Plaintiffs' intellectual property.  To date, however, despite repeated entreaties from Milliman, neither Gradient nor Mr. Smith have provided any substantive written response to Milliman's accusations.  Likewise, they have offered no substantive argument regarding why they contend the "Group Risk Score" service does not violate Plaintiffs' intellectual property rights.

118.    To the contrary, during these communications, Mr. Smith made comments that specifically confirmed that Gradient's own existing and prospective clients recognized and were

concerned about the obvious similarities between Milliman's patented and trade-secret protected Curv platform and Gradient's "Group Risk Score."

119.    Gradient's and Mr. Smith's refusal to provide any meaningful assurances regarding their activities or to engage in a productive dialogue with Milliman supports Milliman's assertion and has left Milliman with no choice but to file suit.

## COUNT I—INFRINGEMENT OF THE '641 PATENT
### Against Gradient

120.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

121.    Upon information and belief, Gradient is now and/or has been directly and/or indirectly infringing at least the system claims of the '641 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from Plaintiffs, using and/or making within the United States, including this district, and/or inducing its customers to use, a retrieval system that retrieves de-identified healthcare data for a known group of individuals and generates a "Group Risk Score," whose use infringes systems claimed in the '641 Patent, including at least claim 7.

122.    Upon information and belief, Gradient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, system claims of the '641 Patent, including at least claim 7, by using and/or making its PHI de-identification system in the United States without authority.

123.    As a direct and proximate result of Gradient's infringement of the '641 Patent, Plaintiffs have been and continue to be damaged.

124.    Upon information and belief, Gradient has indirectly infringed and continues to indirectly infringe system claims of the '641 Patent, including at least claim 7, by actively inducing its customers and/or partners to use its PHI de-identification system in the United

States, without authority, in a manner that directly infringes, literally or under the doctrine of equivalents, systems claimed in the '641 Patent, including at least claim 7. Among other things, for example, Gradient makes its PHI de-identification system available to its customers with instructions on how to use it in a manner such that Gradient's customers are beneficial users of the Gradient's system within the United States. As a result, Gradient's customers infringe, through their beneficial use of Gradient's system, at least claim 7 of the '641 Patent. Furthermore, Gradient was aware of the '641 Patent at least by February 8, 2021 as a result of the communications about the Asserted Patents between Milliman and Mr. Smith described in Paragraphs 115-16 and was aware of or was willfully blind to it prior to that date given Mr. Smith's and Mr. Pettus' former employment with Milliman, their familiarity with the Curv platform, including Milliman's relationship with Vigilytics for the retrieval system that retrieves de-identified healthcare data for a known group of individuals used by Curv, and their general industry knowledge that Vigilytics owns patents on computerized de-identification services. Gradient knew or has been willfully blind to the fact that that its actions would induce direct infringement by its customers through, at least, use in the U.S. of systems claimed in the '641 Patent, including at least claim 7, and intended that its actions would induce direct infringement by such customers.

125.    As a direct and proximate result of Gradient's indirect infringement of the '641 Patent, Plaintiffs have been and continue to be damaged.

126.    By engaging in the conduct described herein, Gradient has injured Plaintiffs and is thus liable for infringement of the '641 Patent, pursuant to 35 U.S.C. § 271.

127.    Gradient has committed these acts of infringement without license or authorization.

128.    Gradient has committed these acts of infringement with knowledge of the '641 Patent and thus has acted recklessly and willfully with regard to Plaintiffs' rights in the '641 Patent.

129.    In accordance with 35 U.S.C. § 287, Gradient has had actual notice and knowledge of its alleged infringement of the '641 Patent as of at least February 2021 and no later than the filing of this complaint and/or the date this complaint was served upon Gradient. On information and belief, Gradient continues without license to make, use, import into, sell, and/or induce others to use in the United States its Group Risk Score service.

130.    As a result of Defendants' willful infringement of the '641 Patent, Plaintiffs have suffered monetary damages and are entitled to a monetary judgment in an amount adequate to compensate for Gradient's past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

## COUNT II—INFRINGEMENT OF THE '892 PATENT
### Against Gradient

131.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

132.    Upon information and belief, Gradient is now and/or has been directly and/or indirectly infringing at least the system claims of the '892 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from Plaintiffs, using and/or making within the United States, including this district, and/or inducing its customers to use, a retrieval system that retrieves de-identified healthcare data for a known group of individuals and generates a "Group Risk Score," whose use infringes systems claimed in the '892 Patent, including at least claim 11.

133.    Upon information and belief, Gradient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, system claims of the '892 Patent,

including at least claim 11, by using and/or making its PHI de-identification system in the United States without authority.

134.    As a direct and proximate result of Gradient's infringement of the '892 Patent, Plaintiffs have been and continue to be damaged.

135.    Upon information and belief, Gradient has indirectly infringed and continues to indirectly infringe system claims of the '892 Patent, including at least claim 11, by actively inducing its customers and/or partners to use its PHI de-identification system in the United States, without authority, in a manner that directly infringes, literally or under the doctrine of equivalents, systems claimed in the '892 Patent, including at least claim 11.  Among other things, for example, Gradient makes its PHI de-identification system available to its customers with instructions on how to use it in a manner such that Gradient's customers are beneficial users of the Gradient's system within the United States.  As a result, Gradient's customers infringe, through their beneficial use of Gradient's system, at least claim 11 of the '892 Patent. Furthermore, Gradient was aware of the '892 Patent at least by February 8, 2021 as a result of the communications about the Asserted Patents between Milliman and Mr. Smith described in Paragraphs 115-16 and was aware of or was willfully blind to it prior to that date given Mr. Smith's and Mr. Pettus' former employment with Milliman, their familiarity with the Curv platform, including Milliman's relationship with Vigilytics for the retrieval system that retrieves de-identified healthcare data for a known group of individuals used by Curv, and their general industry knowledge that Vigilytics owns patents on computerized de-identification services. Gradient knew or has been willfully blind to the fact that that its actions would induce direct infringement by its customers through, at least, use in the U.S. of systems claimed in the '892 Patent, including at least claim 11, and intended that its actions would induce direct infringement

by such customers.

136.    As a direct and proximate result of Gradient's indirect infringement of the '892 Patent, Plaintiffs have been and continue to be damaged.

137.    By engaging in the conduct described herein, Gradient has injured Plaintiffs and is thus liable for infringement of the '892 Patent, pursuant to 35 U.S.C. § 271.

138.    Gradient has committed these acts of infringement without license or authorization.

139.    Gradient has committed these acts of infringement with knowledge of the '892 Patent and thus has acted recklessly and willfully with regard to Plaintiffs' rights in the '892 Patent.

140.    In accordance with 35 U.S.C. § 287, Gradient has had actual notice and knowledge of its alleged infringement of the '892 Patent as of at least February 2021 and no later than the filing of this complaint and/or the date this complaint was served upon Gradient. On information and belief, Gradient continues without license to make, use, import into, sell, and/or induce others to use in the United States its Group Risk Score service.

141.    As a result of Defendants' willful infringement of the '892 Patent, Plaintiffs have suffered monetary damages and are entitled to a monetary judgment in an amount adequate to compensate for Gradient's past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

## COUNT III—INFRINGEMENT OF THE '685 PATENT
### Against Gradient

142.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

143.    Upon information and belief, Gradient is now and/or has been directly and/or

indirectly infringing at least the system claims of the '685 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from Plaintiffs, using and/or making within the United States, including this district, and/or inducing its customers to use, a PHI de-identification system to generate a "Group Risk Score," whose use infringes systems claimed in the '685 Patent, including at least claim 7.

144.    Upon information and belief, Gradient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, system claims of the '685 Patent, including at least claim 7, by using and/or making its PHI de-identification system in the United States without authority.

145.    As a direct and proximate result of Gradient's infringement of the '685 Patent, Plaintiffs have been and continue to be damaged.

146.    Upon information and belief, Gradient has indirectly infringed and continues to indirectly infringe at least the system claims of the '685 Patent, including at least claim 7, by actively inducing its customers and/or partners to use its PHI de-identification system in the United States, without authority, in a manner that directly infringes, literally or under the doctrine of equivalents, systems claimed in the '685 Patent, including at least claim 7.  Among other things, for example, Gradient makes its PHI de-identification system available to its customers with instructions on how to use it in a manner such that Gradient's customers are beneficial users of Gradient's system within the United States.  As a result, Gradient's customers infringe, through their beneficial use of Gradient's system, at least claim 7 of the '685 Patent. Furthermore, Gradient was aware of the '685 Patent at least by February 8, 2021 as a result of the communications about the Asserted Patents between Milliman and Mr. Smith described in Paragraphs 115-16 and was aware of or was willfully blind to it prior to that date given Mr.

Smith's and Mr. Pettus' former employment with Milliman, their familiarity with the Curv platform, including Milliman's relationship with Vigilytics for the de-identification process used by Curv, and their general industry knowledge that Vigilytics owns patents on computerized de-identification services.  Gradient knew or has been willfully blind to the fact that its actions would induce direct infringement by its customers through, at least, use in the U.S. of systems claimed in the '685 Patent, including at least claim 7, and intended that its actions would induce direct infringement by such customers.

147.    As a direct and proximate result of Gradient's indirect infringement of the '685 Patent, Plaintiffs have been and continue to be damaged.

148.    By engaging in the conduct described herein, Gradient has injured Plaintiffs and is thus liable for infringement of the '685 Patent, pursuant to 35 U.S.C. § 271.

149.    Gradient has committed these acts of infringement without license or authorization.

150.    Gradient has committed these acts of infringement with knowledge of the '685 Patent and thus has acted recklessly and willfully with regard to Plaintiffs' rights in the '685 Patent.

151.    In accordance with 35 U.S.C. § 287, Gradient has had actual notice and knowledge of its alleged infringement of the '685 Patent as of at least February 2021 and no later than the filing of this complaint and/or the date this complaint was served upon Gradient. On information and belief, Gradient continues without license to make, use, import into, sell, and/or induce others to use in the United States its Group Risk Score service.

152.    As a result of Defendants' willful infringement of the '685 Patent, Plaintiffs have suffered monetary damages and are entitled to a monetary judgment in an amount adequate to

compensate for Gradient's past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

## COUNT IV—INFRINGEMENT OF THE '651 PATENT
### Against Gradient

153.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

154.    Upon information and belief, Gradient is now and/or has been directly and/or indirectly infringing at least the system claims of the '651 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from Plaintiffs, using and/or making within the United States, including this district, and/or inducing its customers to use, a PHI de-identification system to generate a "Group Risk Score," whose use infringes systems claimed in the '651 Patent, including at least claim 7.

155.    Upon information and belief, Gradient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, system claims of the '651 Patent, including at least claim 7, by using and/or making its PHI de-identification system in the United States without authority.

156.    As a direct and proximate result of Gradient's infringement of the '651 Patent, Plaintiffs have been and continue to be damaged.

157.    Upon information and belief, Gradient has indirectly infringed and continues to indirectly infringe at least the system claims of the '651 Patent, including at least claim 7, by actively inducing its customers and/or partners to use its PHI de-identification system in the United States, without authority, in a manner that, in a manner that directly infringes, literally or under the doctrine of equivalents, systems claimed in the '651 Patent, including at least claim 7. Among other things, Gradient makes its PHI de-identification system available to its customers

with instructions on how to use it in a manner such that Gradient's customers are beneficial users of Gradient's system within the United States.  As a result, Gradient's customers infringe, through their beneficial use of Gradient's system, at least claim 7 of the '651 Patent. Furthermore, Gradient was aware of the '651 Patent at least by February 8, 2021 as a result of the communications about the Asserted Patents between Milliman and Mr. Smith described in Paragraphs 115-16 and was aware of or was willfully blind to it prior to that date given Mr. Smith's and Mr. Pettus' former employment with Milliman, their familiarity with the Curv platform, including Milliman's relationship with Vigilytics for the de-identification process used by Curv, and their general industry knowledge that Vigilytics owns patents on computerized de-identification services.  Gradient knew or has been willfully blind to the fact that its actions would induce direct infringement by its customers through, at least, use in the U.S. of systems claimed in the '651 Patent, including at least claim 7, and intended that its actions would induce direct infringement by such customers.

158.    As a direct and proximate result of Gradient's indirect infringement of the '651 Patent, Plaintiffs have been and continue to be damaged.

159.    By engaging in the conduct described herein, Gradient has injured Plaintiffs and is thus liable for infringement of the '651 Patent, pursuant to 35 U.S.C. § 271.

160.    Gradient has committed these acts of infringement without license or authorization.

161.    Gradient has committed these acts of infringement with knowledge of the '651 Patent and thus has acted recklessly and willfully with regard to Plaintiffs' rights in the '651 Patent.

162.    In accordance with 35 U.S.C. § 287, Gradient has had actual notice and

knowledge of its alleged infringement of the '651 Patent as of at least February 2021 and no later than the filing of this complaint and/or the date this complaint was served upon Gradient. On information and belief, Gradient continues without license to make, use, import into, sell, and/or induce others to use in the United States its Group Risk Score service.

163.    As a result of Defendants' willful infringement of the '651 Patent, Plaintiffs have suffered monetary damages and are entitled to a monetary judgment in an amount adequate to compensate for Gradient's past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

## COUNT V—INFRINGEMENT OF THE '375 PATENT
### Against Gradient

164.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

165.    Upon information and belief, Gradient is now and/or has been directly and/or indirectly infringing at least the system claims of the '375 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from Plaintiffs, using and/or making within the United States, including this district, and/or inducing its customers to use, a PHI de-identification system to generate a "Group Risk Score," whose use infringes systems claimed in the '375 Patent, including at least claim 7.

166.    Upon information and belief, Gradient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, system claims of the '375 Patent, including at least claim 7, by using and/or making its PHI de-identification system in the United States without authority.

167.    As a direct and proximate result of Gradient's infringement of the '375 Patent, Plaintiffs have been and continue to be damaged.

168.     Upon information and belief, Gradient has indirectly infringed and continues to indirectly infringe at least the system claims of the '375 Patent, including at least claim 7, by actively inducing its customers to use its PHI de-identification system in the United States, without authority, in a manner that directly infringes, literally or under the doctrine of equivalents, at least the systems claimed in the '375 Patent, including at least claim 7.  Among other things, Gradient makes its PHI de-identification system available to its customers with instructions on how to use it in a manner such that Gradient's customers are beneficial users of Gradient's system within the United States.  As a result, Gradient's customers infringe, through their beneficial use of Gradient's system, at least claim 7 of the '375 Patent.  Furthermore, Gradient was aware of the '375 Patent at least by February 8, 2021 as a result of the communications about the Asserted Patents between Milliman and Mr. Smith described in Paragraphs 115-16 and was aware of or was willfully blind to it prior to that date given Mr. Smith's and Mr. Pettus' former employment with Milliman, their familiarity with the Curv platform, including Milliman's relationship with Vigilytics for the de-identification process used by Curv, and their general industry knowledge that Vigilytics owns patents on computerized de-identification services.  Gradient knew or has been willfully blind to the fact that its actions would induce direct infringement by its customers through, at least, use in the U.S. of systems claimed in the '375 Patent, including at least claim 7, and intended that its actions would induce direct infringement by such customers.

169.     As a direct and proximate result of Gradient's indirect infringement of the '375 Patent, Plaintiffs have been and continue to be damaged.

170.     By engaging in the conduct described herein, Gradient has injured Plaintiffs and is thus liable for infringement of the '375 Patent, pursuant to 35 U.S.C. § 271.

171.    Gradient has committed these acts of infringement without license or authorization.

172.    Gradient has committed these acts of infringement with knowledge of the '375 Patent and thus has acted recklessly and willfully with regard to Plaintiffs' rights in the '375 Patent.

173.    In accordance with 35 U.S.C. § 287, Gradient has had actual notice and knowledge of its alleged infringement of the '375 Patent as of at least February 2021 and no later than the filing of this complaint and/or the date this complaint was served upon Gradient. On information and belief, Gradient continues without license to make, use, import into, sell, and/or induce others to use in the United States its Group Risk Score service.

174.    As a result of Defendants' willful infringement of the '375 Patent, Plaintiffs have suffered monetary damages and are entitled to a monetary judgment in an amount adequate to compensate for Gradient's past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

### COUNT VI—INFRINGEMENT OF THE '012 PATENT
### Against Gradient

175.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

176.    Upon information and belief, Gradient is now and/or has been directly and/or indirectly infringing at least the system claims of the '012 Patent, as proscribed by 35 U.S.C. §§ 271 *et seq.*, by, without permission or authority from Plaintiffs, using and/or making within the United States, including this district, and/or inducing its customers to use, a PHI de-identification system to generate a "Group Risk Score," whose use infringes systems claimed in the '012 Patent, including at least claim 7.

177.    Upon information and belief, Gradient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, system claims of the '012 Patent, including at least claim 7, by using and/or making its PHI de-identification system in the United States without authority.

178.    As a direct and proximate result of Gradient's infringement of the '012 Patent, Plaintiffs have been and continue to be damaged.

179.    Upon information and belief, Gradient has indirectly infringed and continues to indirectly infringe at least the system claims of the '012 Patent, including at least claim 7, by actively inducing its customers to use its PHI de-identification system in the United States, without authority, in a manner that directly infringes, literally or under the doctrine of equivalents, systems claimed in the '012 Patent, including at least claim 7.  Among other things, Gradient makes its PHI de-identification system available to its customers and/or partners with instructions on how to use it in a manner such that Gradient's customers are beneficial users of Gradient's system within the United States.  As a result, Gradient's customers infringe, through their beneficial use of Gradient's system, at least claim 7 of the '012 Patent.  Furthermore, Gradient was aware of the '012 Patent at least by February 8, 2021 as a result of the communications about the Asserted Patents between Milliman and Mr. Smith described in Paragraphs 115-16 and was aware of or was willfully blind to it prior to that date given Mr. Smith's and Mr. Pettus' former employment with Milliman, their familiarity with the Curv platform, including Milliman's relationship with Vigilytics for the de-identification process used by Curv, and their general industry knowledge that Vigilytics owns patents on computerized de-identification services.  Gradient knew or has been willfully blind to the fact that its actions would induce direct infringement by its customers through, at least, use in the U.S. of systems

claimed in the '012 Patent, including at least claim 7, and intended that its actions would induce direct infringement by such customers.

180.    As a direct and proximate result of Gradient's indirect infringement of the '012 Patent, Plaintiffs have been and continue to be damaged.

181.    By engaging in the conduct described herein, Gradient has injured Plaintiffs and is thus liable for infringement of the '012 Patent, pursuant to 35 U.S.C. § 271.

182.    Gradient has committed these acts of infringement without license or authorization.

183.    Gradient has committed these acts of infringement with knowledge of the '012 Patent and thus has acted recklessly and willfully with regard to Plaintiffs' rights in the '012 Patent.

184.    In accordance with 35 U.S.C. § 287, Gradient has had actual notice and knowledge of its alleged infringement of the '012 Patent as of at least February 2021 and no later than the filing of this complaint and/or the date this complaint was served upon Gradient. On information and belief, Gradient continues without license to make, use, import into, sell, and/or induce others to use in the United States its Group Risk Score service.

185.    As a result of Defendants' willful infringement of the '012 Patent, Plaintiffs have suffered monetary damages and are entitled to a monetary judgment in an amount adequate to compensate for Gradient's past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

## COUNT VII—BREACH OF CONFIDENTIALITY AGREEMENT
### Against Stanford A. Smith and Samuel Chase Pettus

186.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

187.    Milliman, on the one hand, and Mr. Smith and Mr. Pettus, respectively, on the other hand, are parties to binding contracts, the Confidentiality Agreements.

188.    Milliman has fully performed its obligations under the Confidentiality Agreements.

189.    The Confidentiality Agreements required Mr. Smith and Mr. Pettus to keep "strictly confidential" Milliman's Confidential Information, including its Trade Secrets, to not use them except as needed within the scope of their Milliman employment, and to not "copy, use or disclose" them after termination of their employment with Milliman.

190.    Mr. Smith breached the Confidentiality Agreement by, in his capacity as founder and CEO of Gradient, using and disclosing to Gradient Milliman's Confidential Information, including its Trade Secrets, for use in the development of Gradient's "Group Risk Score" offering.

191.    Mr. Pettus breached the Confidentiality Agreement by, in his capacity first as a Gradient sales executive and then as Gradient Sales Director, Health, using and disclosing to Gradient Milliman's Confidential Information, including its Trade Secrets, for use in the development of Gradient's "Group Risk Score" offering.

192.    As a direct and proximate result of Mr. Smith's and Mr. Pettus' breaches, Milliman has lost its substantial advantage over Gradient in the marketplace for health insurance underwriting predictive analytics, has lost existing and prospective customers to Gradient, and has suffered price erosion resulting in decreased revenue.

193.    As a direct and proximate result of Mr. Smith's and Mr. Pettus' breach of contract, Milliman has suffered damages in an amount to be proven at trial.

## COUNT VIII—VIOLATION OF DEFEND TRADE SECRETS ACT
### Against Stanford A. Smith and Samuel Chase Pettus

194.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

195.    This claim arises under the federal DTSA, 18 U.S.C. § 1836, which prohibits the misappropriation of trade secrets.

196.    The Trade Secrets, which pertain to the operation, model structure, pricing and sale methodology of Milliman's Curv platform, are protected trade secrets under the DTSA.

197.    Milliman offers, sells, and uses its Curv platform in interstate commerce.

198.    Information regarding the Trade Secrets is not generally known or readily ascertainable to others and has substantial value to competitors, such as Gradient, that are entering or operating in the health insurance underwriting field.

199.    Milliman developed the Trade Secrets at substantial expense and with the input of significant time and effort, and Milliman's Curv platform enjoyed a significant competitive advantage in the marketplace of health insurance predictive analytics as a result of the Trade Secrets.

200.    Milliman took reasonable steps to ensure the confidentiality of its Trade Secrets and protect against their disclosure, including by requiring all employees (including Mr. Smith and Mr. Pettus), as a condition of their employment, to sign confidentiality agreements prohibiting disclosure of Milliman's trade secrets, limiting the information available publicly regarding Curv to solely high-level marketing statements, requiring all prospective and existing customers of Curv to sign non-disclosure agreements prior to accessing any more specific information, marking all such materials disclosed to prospects and customers as confidential and proprietary, and protecting the Curv platform itself with a series of technological measures,

including allowing access to only authorized users, through user-name and password restrictions, limiting what aspects of the platform even authorized users are able to view, and conducting security testing.

201.    Mr. Smith and Mr. Pettus obtained Milliman's Trade Secrets during the course of their employment at Milliman and were under an obligation, including pursuant to the Confidentiality Agreement they each executed, to maintain the secrecy of and not disclose to others those Trade Secrets.

202.    Upon information and belief, Mr. Smith and Mr. Pettus unlawfully disclosed Milliman's Trade Secrets to Gradient, in knowing violation of their secrecy obligations to Milliman and without Milliman's consent, permission, or authorization, in order to facilitate and accelerate Gradient's development of its "Group Risk Score" offering.

203.    At all relevant times, Mr. Smith and Mr. Pettus had actual knowledge that they had no consent, permission or authorization from Milliman for their conduct.

204.    Mr. Smith's and Mr. Pettus' disclosure of Milliman's Trade Secrets to Gradient has directly and proximately resulted in Milliman suffering the loss of its significant competitive advantage in the marketplace, including the loss of certain existing and prospective clients and price erosion resulting in decreased revenue.

205.    Mr. Smith's and Mr. Pettus' disclosure of Milliman's Trade Secrets to Gradient has directly and proximately resulted in Gradient gaining an unfair business advantage in the market for health insurance predictive analytics without having to expend the effort, time, or resources required to independently develop and optimize its "Group Risk Score" offering, pricing, and marketing.

206.    As a result of Mr. Smith's and Mr. Pettus' wrongful actions, Milliman has been

damaged and will continue to be damaged in an amount to be proven at trial.

207.    As a result of Mr. Smith's and Mr. Pettus' wrongful actions, Mr. Smith, in his capacity as CEO of Gradient, and Mr. Pettus, in his capacity first as a Gradient sales executive and then as Gradient Sales Director, Health, have unjustly received profits in an amount to be proven at trial.

208.    Mr. Smith's and Mr. Pettus' conduct was willful and malicious and, on that basis, requires the imposition of exemplary damages in an amount to be determined at trial.

209.    As a result of Mr. Smith's and Mr. Pettus' actions, Milliman is entitled to damages pursuant to the DTSA, including its costs, attorneys' fees and exemplary damages, in an amount to be proven at trial.

210.    Mr. Smith's and Mr. Pettus' use and disclosure of Milliman's Trade Secrets has caused and will continue to cause Milliman irreparable harm.  Unless preliminarily and permanently enjoined, Mr. Smith's and Mr. Pettus' use and disclosure of Milliman's Trade Secrets in connection with their work for Gradient, as alleged herein, will continue to cause Milliman irreparable harm, loss and injury.

### COUNT IX—VIOLATION OF DEFEND TRADE SECRETS ACT
### Against Gradient

211.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

212.    This claim arises under the federal DTSA, 18 U.S.C. § 1836, which prohibits the misappropriation of trade secrets.

213.    The Trade Secrets, which pertain to the operation, model structure, pricing and sale methodology of Milliman's Curv platform, are protected trade secrets under the DTSA.

214.    Milliman offers, sells, and uses its Curv platform in interstate commerce.

215.    Information regarding the Trade Secrets is not generally known or readily ascertainable to others and has substantial value to competitors, such as Gradient, that are entering or operating in the health insurance underwriting field.

216.    Milliman developed the Trade Secrets at substantial expense and with the input of significant time and effort, and Milliman's Curv platform enjoyed a significant competitive advantage in the marketplace of health insurance predictive analytics as a result of the Trade Secrets.

217.    Milliman took reasonable steps to ensure the confidentiality of its Trade Secrets and protect against their disclosure, including by requiring all employees, as a condition of their employment, to sign confidentiality agreements prohibiting disclosure of Milliman's trade secrets, limiting the information available publicly regarding Curv to solely high-level marketing statements, requiring all prospective and existing customers of Curv to sign non-disclosure agreements prior to accessing any more specific information, marking all such materials disclosed to prospects and customers as confidential and proprietary, and protecting the Curv platform itself with a series of technological measures, allowing access to only authorized users, through user-name and password restrictions, limiting what aspects of the platform even authorized users are able to view, and conducting security testing.

218.    Upon information and belief, Gradient unlawfully obtained Milliman's Trade Secrets from Milliman's former employees, including Mr. Smith and Mr. Pettus, knowing they were bound to keep the Trade Secrets confidential and not disclose them, including pursuant to their obligations under signed Confidentiality Agreements.  Knowing it was in unlawful possession of the Trade Secrets, Gradient then further misappropriated those Trade Secrets by using them to develop Gradient's "Group Risk Score" offering, without Milliman's consent,

permission, or authorization, and for Gradient's sole economic benefit.

219.    At all relevant times, Gradient had actual knowledge that it had no consent, permission or authorization from Milliman for its conduct.

220.    Gradient's misappropriation of Milliman's Trade Secrets has directly and proximately resulted in Milliman suffering the loss of its significant competitive advantage in the marketplace, including the loss of certain existing and prospective clients and price erosion resulting in decreased revenue.

221.    Gradient's misappropriation of Milliman's Trade Secrets has directly and proximately resulted in Gradient gaining an unfair business advantage in the market for health insurance predictive analytics without having to expend the effort, time, or resources required to independently develop and optimize its "Group Risk Score" offering, pricing, and marketing.

222.    As a result of Gradient's wrongful actions, Milliman has been damaged and will continue to be damaged in an amount to be proven at trial.

223.    As a result of Gradient's wrongful actions, Gradient has unjustly received profits in an amount to be proven at trial.

224.    Gradient's conduct was willful and malicious and, on that basis, requires the imposition of exemplary damages in an amount to be determined at trial.

225.    As a result of Gradient's actions, Milliman is entitled to damages pursuant to the DTSA, including its costs, attorneys' fees and exemplary damages, in an amount to be proven at trial.

226.    The foregoing acts of Gradient have caused and will continue to cause Milliman irreparable harm.  Unless permanently enjoined, Gradient's acts alleged herein will continue to cause Milliman irreparable harm, loss and injury.

## COUNT X—VIOLATION OF MASSACHUSETTS UNIFORM TRADE SECRET ACT
### Against Stanford A. Smith and Samuel Chase Pettus

227.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

228.    This claim arises under the MUTSA, Mass. Gen. L. c. 93, §§ 42 *et seq*., which prohibits the misappropriation of trade secrets.

229.    The Trade Secrets, which pertain to the operation, model structure, pricing and sale methodology of Milliman's Curv platform, are protected trade secrets under the MUTSA.

230.    Information regarding the Trade Secrets is not generally known or readily ascertainable to others and has substantial value to competitors, such as Gradient, that are entering or operating in the health insurance underwriting field.

231.    Milliman developed the Trade Secrets at substantial expense and with the input of significant time and effort, and Milliman's Curv platform enjoyed a significant competitive advantage in the marketplace of health insurance predictive analytics as a result of the Trade Secrets.

232.    Milliman took reasonable steps to ensure the confidentiality of its Trade Secrets and protect against their disclosure, including by requiring all employees (including Mr. Smith and Mr. Pettus), as a condition of their employment, to sign confidentiality agreements prohibiting disclosure of Milliman's trade secrets, limiting the information available publicly regarding Curv to solely high-level marketing statements, requiring all prospective and existing customers to sign non-disclosure agreements prior to accessing any more specific information, marking all such materials disclosed to prospects and customers as confidential and proprietary, and protecting the Curv platform itself with a series of technological measures, including allowing access to only authorized users, through user-name and password restrictions, limiting

what aspects of the platform even authorized users are able to view, and conducting security testing.

233.    Mr. Smith and Mr. Pettus obtained Milliman's Trade Secrets during the course of their employment at Milliman and were under an obligation, including pursuant to the Confidentiality Agreement they each executed, to maintain the secrecy of and not disclose to others those Trade Secrets.

234.    Upon information and belief, Mr. Smith and Mr. Pettus unlawfully disclosed Milliman's Trade Secrets to Gradient, in knowing violation of their secrecy obligations to Milliman and without Milliman's consent, permission, or authorization, in order to facilitate and accelerate Gradient's development of its "Group Risk Score" offering.

235.    At all relevant times, Mr. Smith and Mr. Pettus had actual knowledge that they had no consent, permission or authorization from Milliman for their conduct.

236.    Mr. Smith's and Mr. Pettus' disclosure of Milliman's Trade Secrets to Gradient has directly and proximately resulted in Milliman suffering the loss of its significant competitive advantage in the marketplace, including the loss of certain existing and prospective clients and price erosion resulting in decreased revenue.

237.    Mr. Smith's and Mr. Pettus' disclosure of Milliman's Trade Secrets to Gradient has directly and proximately resulted in Gradient gaining an unfair business advantage in the market for health insurance predictive analytics without having to expend the effort, time, or resources required to independently develop and optimize its "Group Risk Score" offering, pricing, and marketing.

238.    As a result of Mr. Smith's and Mr. Pettus' wrongful actions, Milliman has been damaged and will continue to be damaged in an amount to be proven at trial.

239.    As a result of Mr. Smith's and Mr. Pettus' wrongful actions, Mr. Smith, in his capacity as CEO of Gradient, and Mr. Pettus, in his capacity first as a Gradient sales executive and then as Gradient Sales Director, Health, have unjustly received profits in an amount to be proven at trial.

240.    Mr. Smith's and Mr. Pettus' conduct was willful and malicious and, on that basis, requires the imposition of punitive damages in an amount to be determined at trial.

241.    As a result of Mr. Smith's and Mr. Pettus' actions, Milliman is entitled to damages pursuant to the MUTSA, including its costs, attorneys' fees and punitive damages, in an amount to be proven at trial.

242.    Mr. Smith's and Mr. Pettus' use and disclosure of Milliman's Trade Secrets has caused and will continue to cause Milliman irreparable harm.  Unless permanently enjoined, Mr. Smith's and Mr. Pettus' use and disclosure of Milliman's Trade Secrets in connection with their work for Gradient, as alleged herein, will continue to cause Milliman irreparable harm, loss and injury.

## COUNT XI—VIOLATION OF MASSACHUSETTS UNIFORM TRADE SECRET ACT
### Against Gradient

243.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

244.    This claim arises under the MUTSA, Mass. Gen. L. c. 93, §§ 42 *et seq*., which prohibits the misappropriation of trade secrets.

245.    The Trade Secrets, which pertain to the operation, model structure, pricing and sale methodology of Milliman's Curv platform, are protected trade secrets under the MUTSA.

246.    Information regarding the Trade Secrets is not generally known or readily ascertainable to others and has substantial value to competitors, such as Gradient, that are

entering or operating in the health insurance underwriting field.

247.    Milliman developed the Trade Secrets at substantial expense and with the input of significant time and effort, and Milliman's Curv platform enjoyed a significant competitive advantage in the marketplace of health insurance predictive analytics as a result of the Trade Secrets.

248.    Milliman took reasonable steps to ensure the confidentiality of its Trade Secrets and protect against their disclosure, including by requiring all employees, as a condition of their employment, to sign confidentiality agreements prohibiting disclosure of Milliman's trade secrets, limiting the information available publicly regarding Curv to solely high-level marketing statements, requiring all prospective and existing customers to sign non-disclosure agreements prior to accessing any more specific information, marking all such materials disclosed to prospects and customers as confidential and proprietary, and protecting the Curv platform itself with a series of technological measures, including allowing access to only authorized users, through user-name and password restrictions, limiting what aspects of the platform even authorized users are able to view, and conducting security testing.

249.    Upon information and belief, Gradient unlawfully obtained Milliman's Trade Secrets from Milliman's former employees, including Mr. Smith and Mr. Pettus, knowing they were bound to keep the Trade Secrets confidential and not disclose them, including pursuant to their obligations under signed Confidentiality Agreements.  Knowing it was in unlawful possession of the Trade Secrets, Gradient then further misappropriated those Trade Secrets by using them to develop Gradient's "Group Risk Score" offering, without Milliman's consent, permission, or authorization, and for Gradient's sole economic benefit.

250.    At all relevant times, Gradient had actual knowledge that it had no consent,

permission or authorization from Milliman for its conduct.

251.    Gradient's misappropriation of Milliman's Trade Secrets has directly and proximately resulted in Milliman suffering the loss of its significant competitive advantage in the marketplace, including the loss of certain existing and prospective clients and price erosion resulting in decreased revenue.

252.    Gradient's misappropriation of Milliman's Trade Secrets has directly and proximately resulted in Gradient gaining an unfair business advantage in the market for health insurance predictive analytics without having to expend the effort, time, or resources required to independently develop and optimize its "Group Risk Score" offering, pricing, and marketing.

253.    As a result of Gradient's wrongful actions, Milliman has been damaged and will continue to be damaged in an amount to be proven at trial.

254.    As a result of Gradient's wrongful actions, Gradient has unjustly received profits in an amount to be proven at trial.

255.    Gradient's conduct was willful and malicious and, on that basis, requires the imposition of punitive damages in an amount to be determined at trial.

256.    As a result of Gradient's actions, Milliman is entitled to damages pursuant to the MUTSA, including its costs, attorneys' fees and punitive damages, in an amount to be proven at trial.

257.    The foregoing acts of Gradient have caused and will continue to cause Milliman irreparable harm.  Unless permanently enjoined, Gradient's acts alleged herein will continue to cause Milliman irreparable harm, loss and injury.

## COUNT XII—UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF MASS. GEN. L. c. 93A
### Against All Defendants

258.    The allegations set forth in each and every preceding paragraph are incorporated

herein by reference.

259.    At all relevant times, Milliman has been engaged in trade or commerce within the meaning of Mass. Gen. L. c. 93A, §§ 2 and 11.

260.    At all relevant times, Mr. Smith has been engaged in trade or commerce within the meaning of Mass. Gen. L. c. 93A, §§ 2 and 11.

261.    At all relevant times, Mr. Pettus has been engaged in trade or commerce within the meaning of Mass. Gen. L. c. 93A, §§ 2 and 11.

262.    At all relevant times, Gradient has been engaged in trade or commerce within the meaning of Mass. Gen. L. c. 93A, §§ 2 and 11.

263.    Mr. Smith and Mr. Pettus have engaged in unfair and deceptive trade practices and unfair competition by misappropriating and, upon information and belief, disseminating and using Milliman's confidential information and Trade Secrets.

264.    Mr. Smith's and Mr. Pettus' conduct took place primarily and substantially in the Commonwealth of Massachusetts.

265.    Upon information and belief, Gradient has engaged in unfair and deceptive trade practices and unfair competition by taking delivery of Milliman's confidential information and Trade Secrets from Mr. Smith and Mr. Pettus, notwithstanding Gradient's awareness that Mr. Smith and Mr. Pettus misappropriated that Milliman confidential information and Trade Secrets in violation of their obligations to Milliman.

266.    Upon information and belief, Gradient has engaged in unfair and deceptive trade practices and unfair competition by encouraging, supporting, and participating in the scheme to misappropriate, disseminate, and use Milliman's confidential information and Trade Secrets.

267.    On information and belief, the conduct of Gradient took place primarily and

substantially in the Commonwealth of Massachusetts.

268.    Defendants' misappropriation of Milliman's confidential information and trade secrets constitutes unfair and deceptive trade practices and unfair competition in violation of Sections 2 and 11 of Chapter 93A of the General Laws of the Commonwealth of Massachusetts.

269.    Defendants' violation of Section 2 was knowing and willful.

270.    As a direct and proximate result of Defendants' unfair and deceptive trade practices and unfair competition, Milliman has been and continues to be injured irreparably and otherwise, and has sustained significant damages, in an amount to be proven at trial.

271.    Pursuant to Mass. Gen. L. c. 93A, Milliman is entitled to treble damages and attorneys' fees due to Defendants' unfair and deceptive trade practices and unfair competition.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court hereby enter judgment against Defendants and provide relief as follows:

      A.    A judgment that Gradient has infringed the Asserted Patents;

      B.    A judgment that Gradient's infringement of the Asserted Patents has been willful;

      C.    An award against Gradient of damages sufficient to compensate Plaintiffs for Gradient's infringement of the Asserted Patents;

      D.    An award against Gradient of all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

E.      A declaration that this is an exceptional case and an award against Gradient and to Plaintiffs of their reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285;

F.      An order preliminarily and permanently enjoining Gradient, and its officers, directors, agents, employees, affiliates, and all others acting in privity or in concert with it, and its parents, subsidiaries, divisions, successors, and assigns from further acts of infringement of the Asserted Patents;

G.      A judgment that Mr. Smith and Mr. Pettus have breached their Confidentiality Agreements;

H.      An award against Mr. Smith and Mr. Pettus of damages sufficient to compensate Milliman for Mr. Smith's and Mr. Pettus' breaches of their Confidentiality Agreements;

I.      A judgment that Mr. Smith, Mr. Pettus and Gradient have misappropriated the Trade Secrets under DTSA and MUTSA and have engaged in unfair and deceptive acts and practices in violation of Mass. Gen. L. c. 93A;

J.      A judgment that Mr. Smith's, Mr. Pettus' and Gradient's trade secret misappropriation and unfair and deceptive acts and practices in violation of Mass. Gen. L. c. 93A have been willful and malicious;

K.      An award against Mr. Smith, Mr. Pettus and Gradient of damages sufficient to compensate Milliman for their trade secret misappropriation and unfair and deceptive acts and practices in violation of Mass. Gen. L. c. 93A;

L.      An award against Mr. Smith, Mr. Pettus and Gradient of exemplary damages up to two times the amount of compensatory damages found for

trade secret misappropriation as provided by 18 U.S.C. § 1836 and Mass. Gen. L. c. 93, § 42B;

M.    An award against Mr. Smith, Mr. Pettus and Gradient of treble damages for their unfair and deceptive acts and practices in violation of Mass. Gen. L. c. 93A;

N.    An award against Mr. Smith, Mr. Pettus and Gradient of Plaintiffs' reasonable attorneys' fees incurred in this action as provided by 18 U.S.C. § 1836, Mass. Gen. L. c. 93, § 42C, and Mass. Gen. L. c. 93A §§ 2, 11;

O.    An order preliminarily and permanently enjoining Mr. Smith, Mr. Pettus, Gradient, and its officers, directors, agents, employees, affiliates, and all others acting in privity or in concert with it, and its parents, subsidiaries, divisions, successors, and assigns from continued use of Milliman's Trade Secrets;

P.    An award against Mr. Smith, Mr. Pettus and Gradient of Plaintiffs' costs and pre- and post-judgment interest; and

Q.    Such other relief that this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable of right by a jury.

Dated:  May 25, 2021                    **K&L GATES LLP**

*/s/ Christopher Centurelli*
Christopher Centurelli (BBO #640974)
christopher.centurelli@klgates.com
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111

61

Telephone: (617) 261-3100
Facsimile: (617) 261-3175

and

Patrick J. McElhinny (*pro hac vice forthcoming*)
patrick.mcelhinny@klgates.com
Mark G. Knedeisen (*pro hac vice forthcoming*)
mark.knedeisen@klgates.com
Anna Shabalov (*pro hac vice forthcoming*)
anna.shabalov@klgates.com
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501

*Attorneys for Milliman, Inc. and Milliman Solutions, LLC*

and

Christopher Dillon (BBO #640896)
dillon@fr.com
Fish & Richardson P.C.
One Marina Park Drive
Boston, MA 02210
Telephone: (617) 542-5070

and

Noah C. Graubart (*pro hac vice forthcoming*)
graubart@fr.com
Joseph R. Dorris (*pro hac vice forthcoming*)
dorris@fr.com
Fish & Richardson P.C.
1180 Peachtree Street NE
21st Floor
Atlanta, GA 30309
Telephone: (404) 892-5005

*Attorneys for Vigilytics LLC*