# EXHIBIT A

Execution Version

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of June 29, 2018 (the "Effective Date"), by and between Arrowhead Technology Corp., a Delaware corporation ("Purchaser"), and Milliman, Inc., a Washington corporation ("Seller"). Purchaser and Seller are collectively referred to herein as the "Parties" and individually as a "Party".

## RECITALS

WHEREAS, Purchaser desires to purchase the Assets as described and defined in Exhibit A hereto (the "Assets") from Seller upon the terms and conditions set forth in this Agreement; and

WHEREAS, Seller desires to sell the Assets to Purchaser, upon the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the premises and of the respective representations and warranties hereinafter set forth and the respective covenants and agreements contained herein, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I.  PURCHASE AND SALE OF ASSETS.

1.1  <u>Purchase and Sale of Assets</u>.   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing  (defined below), Seller shall immediately sell, transfer, convey, assign and deliver to the Purchaser all of Seller's legal right, title and interest in and to the Gradient AI software, data, and technology (collectively, the "Software") and the assets used in connection with the Gradient AI business,  as such Software and assets are described and defined in Exhibit A (the "Assets"). The Assets do not include any medical data or models of any kind (other than Workers Compensation data or models created solely from such Workers Compensation data), including any intellectual property rights related thereto. Without limiting the foregoing exclusion, all rights, title and interest (including any and all intellectual property rights) in and to the data, information, data summaries, and know-how provided by or originating in any part from Seller's health practice (including but not limited to MARA, Healthcost Guidelines, MedInsight, MUGS, any other health software tools, or any information, material, documentation or similar provided by the "Health Steering Committee" and any health consultants), (collectively, the "Health Intellectual Property") shall remain with Seller and shall not be transferred to Purchaser.  Purchaser shall have no license or right to use any Health Intellectual Property by virtue of this Agreement or otherwise.

1.2  <u>Assumed Liabilities</u>.  Purchaser is not assuming any debts, obligations or liabilities of Seller whatsoever, whether known or unknown, actual or contingent, matured or unmatured, currently existing or arising in the future, all of which shall remain the responsibility of Seller, including: (i) any liability of Seller for taxes which arise, are assessed or become payable or due prior to the Closing Date or payable by Seller as a result of purchases, sales or transfers prior to the Closing Date, or other taxes of any kind or description with respect to the Software to the

extent such taxes relate to periods prior to the Closing Date or (ii) any Losses (as defined below) which arise, result from, or relate to any licensing of the Software that occurred on or prior to the Closing Date (collectively, the "Excluded Liabilities"); provided, however, that Purchaser shall assume and fulfill in all respects the obligations under the Assigned Contracts and the software services, including without limitation, implementation, delivery, support, maintenance or other services obligations of Seller that constitute the services provided to licensees under the license agreements relating to the Software listed on the attached Schedule 1.1.12 arising after the Closing Date and such obligations shall not be deemed "Excluded Liabilities", but only to the extent that such liabilities and obligations are for services to be performed after the Closing Date, were incurred in the ordinary course of business, and do not relate to any breach, default, failure to perform, or violation by Seller. Any and all sales, use, or transfer taxes arising as a result of the payments or consummation of the transactions contemplated by this Agreement shall be borne by Seller, which shall be treated as "Excluded Liabilities". Seller and Purchaser agree that within seventy five (75) days after the Closing Date, Purchaser and Seller will perform a reconciliation of all Excluded Liabilities.

      1.3    Purchase Price and Method of Payment. The aggregate purchase price for the Assets and the other rights granted and covenants extended to Purchaser hereunder shall be two million dollars ($2,000,000) (the "Closing Payment"), plus the Post-Closing Payment, as defined below (in the aggregate, the "Purchase Price"), paid as follows:

      (a)    The Closing Payment shall be paid by wire transfer of immediately available funds to an account designated in writing by Seller to Purchaser on the Closing Date.

      (b)    The "Post-Closing Payment" shall be equal to one million dollars ($1,000,000). Such Post-Closing Payment shall payable within sixty (60) days after the Closing by wire transfer of immediately available funds to an account designated in writing by Seller to Purchaser.

      (c)    If Purchaser fails to make payment of the Post-Closing Payment within sixty (60) days after the Closing, the Post-Closing Payment shall be increased to two million dollars ($2,000,000), one million dollars ($1,000,000) of which shall be due on the first anniversary of the Closing Date and the remaining one million dollars ($1,000,000) of which shall be due on the second anniversary of the Closing Date. Failure to make the Post-Closing Payment as set forth in Section 1.3(b) within such 60-day period shall not be a breach of this Agreement and Seller's sole remedy for the failure to make such payment shall be the adjustments set forth in this Section 1.3(c); provided, however, in the event Purchaser fails to make the Post-Closing Payment as set forth in 1.3(b) above, Seller shall have an automatic lien against the Assets to secure the payment of the Post-Closing Payment, which lien shall be automatically discharged and released upon the making of such Post-Closing Payment.

      1.4    Closing Deliveries. At the Closing, Seller shall transfer and/or deliver the Assets to the Purchaser in a mutually acceptable format. The Parties understand and acknowledge that the Software is maintained in a third party cloud environment hosted by AWS (the "Cloud Environment"). Upon Closing, the Parties agree to perform the transition obligations as set forth in Exhibit B attached hereto and incorporated herein by this reference. Further, each Party shall

execute and deliver to the other Party such other documents as are reasonably requested and necessary to complete the transactions contemplated by this Agreement, including the delivery by Seller to Purchaser of the following:

(a) a bill of sale in form and substance satisfactory to Purchaser and duly executed by Seller, transferring the Assets to Purchaser;

(b) an assignment and assumption agreement in form and substance satisfactory to Purchaser, effecting the assignment to and assumption by Purchaser of the Assigned Contracts;

(c) assignments in form and substance satisfactory to Purchaser and duly executed by Seller, transferring all of Seller's right, title and interest in and to the Assets consisting of registered Purchased IP and applications and domain names to Purchaser;

(d) a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Seller certifying as to the resolutions of the board of directors of Seller, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(e) copies of all consents, approvals, waivers, and authorizations required to assign the Assigned Contracts to Purchaser; and

(f) such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement.

1.5     Closing.  The closing (the "Closing") of the purchase and sale of the Assets shall be on July 1, 2018 (the "Closing Date").  Each Party's obligations to close shall be conditioned on the other Party having complied in all material respects with all of that other Party's covenants required to be fulfilled at or prior to Closing under this Agreement.

1.6     Continuing Duties Regarding Intellectual Property.  At any time upon Purchaser's request and at Purchaser's expense, Seller shall cooperate fully with Purchaser in perfecting or otherwise securing all intellectual property rights in the Assets to Purchaser.  Seller shall execute, and shall direct its employees and agents to execute, any documentation as Purchaser may reasonably request from time to time in order to establish, secure, maintain, or protect Purchaser's ownership of the Assets, including all intellectual property rights in the Assets. Seller shall cooperate fully with Purchaser, at Purchaser's expense, and shall take other actions as Purchaser may reasonably request in order to establish, secure, maintain, or protect Purchaser's ownership of, and the commercial viability of, the Assets, such as providing testimony, or directing its employees and agents to provide testimony, in support of inventorship or authorship, or otherwise as Purchaser reasonably desires.

## ARTICLE II. OTHER MATTERS.

2.1     Assigned Contracts. Seller shall assign all of the Assigned Contracts set forth in Schedule 1.1.12 as of the Closing Date. To the extent that Seller's rights under any Assigned Contract or any other Purchased Asset may not be assigned to Purchaser without the consent of another party which has not been obtained, this Agreement shall not constitute an agreement to

3

assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Purchaser's rights under the Asset in question so that Purchaser would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Purchaser's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by law and the Asset, with Purchaser in any other reasonable arrangement designed to provide such benefits to Purchaser. Seller is entitled to any payments that Purchaser actually collects for services performed under Assigned Contracts prior to and on the Closing Date. Seller is responsible for making any payments under Assigned Contracts for services performed under Assigned Contracts prior to and on the Closing Date. Purchaser shall be entitled to payment for all services performed or to be performed by the Gradient AI business after the Closing Date, whether received by Seller or Purchaser. Seller and Purchaser agree that within seventy five (75) days after the Closing Date, Purchaser and Seller will present to each other a reconciliation of amounts received from clients and amounts paid or payable to vendors. Seller and Purchaser will have the right to audit the calculation of any such payments due by one party to the other made within ninety (90) days of the Closing Date.

 2.2 <u>Employment Matters</u>. Seller acknowledges that on or before the Closing Date, Purchaser shall make offers of employment to the employees of Seller listed on <u>Schedule 2.2</u>, which offers shall include salaries that are at least substantially equivalent in value to the employees' current respective salaries, and agrees that the employees who accept such offer of employment with Purchaser (each a "Transferred Employee") shall be employed exclusively by Purchaser as of the Closing Date. Because the Closing Date is at the beginning of the month, Seller will pay the normal costs of the health and related benefits of the Transferred Employees through July 31, 2018; provided that Purchaser agrees to reimburse Seller for the costs of such benefits for the month of July, 2018 (provided, however that Purchaser shall not be responsible for any costs associated with claims for any benefits on or prior to the Closing Date, or any claims for wages, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments). Seller will provide an accounting of such costs to Purchaser at or following the Closing Date. Purchaser agrees to pay such amount to Seller within fifteen (15) days of receipt. Seller shall not take any action directly or indirectly that could reasonably be expected to negatively influence any employee's decision to accept employment with Purchaser. Nothing in this Section 2.2 shall be construed to entitle any Transferred Employee to remain in the employ of Purchaser or to affect the right of Purchaser to terminate any Transferred Employee, at any time. Purchaser's obligations under this Agreement are contingent upon at least 80% of the employees of Seller listed on <u>Schedule 2.2</u> accepting offers of employment with Purchaser as of the Closing Date. Seller hereby waives and releases Stanford Smith and the Transferred Employees, of any and all non-competition and non-solicitation obligations in favor of Seller and its affiliates (excluding the restriction on solicitation of Milliman employees set forth in the Employee Noncompete Agreement between Seller and Stanford Smith, dated August 4, 2011, which shall not be waived hereby), or any other breach of policies, rules, codes of conduct, or other restrictions of Seller and its affiliates that may result from the transactions contemplated hereby, provided, however, that nothing shall prohibit Purchaser or its affiliates from the solicitation or hiring of any employee whose employment has been terminated by

Purchaser or by the employee or pursuant to a general solicitation which is not directed specifically to any such employees.  Upon the request of a Transferred Employee or Purchaser, Seller agrees to issue a letter to such effect.   Until the second anniversary of the Closing Date, Seller shall not, and shall not permit any of its affiliates to, directly or indirectly, solicit for employment or consulting any employees of Purchaser or its affiliates, or encourage any such employee to leave such employment, provided, however, that nothing shall prohibit Seller or its affiliates from the solicitation or hiring of any employee whose employment has been terminated by Purchaser or by the employee or pursuant to a general solicitation which is not directed specifically to any such employees.

## ARTICLE III.      REPRESENTATIONS AND WARRANTIES OF SELLER.

3.1      Existence and Good Standing; Corporate Actions.  Seller is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation.  Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Assets or the operation of the Gradient AI business as currently conducted makes such licensing or qualification necessary.  Seller has full power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  All corporate or other actions and proceedings necessary to be taken by or on the part of Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, including the obtaining of approval by the directors of Seller (no Seller shareholder approval is required), have been duly and validly taken, and this Agreement has been duly and validly authorized, executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with and subject to its respective terms.

3.2      No Defaults.  Neither the execution, delivery or performance by Seller of this Agreement nor the consummation by Seller of the transactions contemplated hereby is an event that, of itself or with the giving of notice or the passage of time or both, will:

(a)      Violate or conflict with the provisions of constitutional or organizational documents of Seller;

(b)      Violate or conflict with or result in any breach of or any default under, result in any termination or modification of, or cause any acceleration of any obligation under, any contract, mortgage, indenture, agreement, lease or other instrument to which Seller is a party or by which it is bound, or by which it may be affected, or result in the creation of any Encumbrance upon any of Seller's assets; or

(c)      Violate any judgment, decree, order, statute, rule or regulation applicable to Seller.

3.3      Approvals and Consents.  No approvals or consents of persons or entities, not a party to this Agreement, are legally or contractually required to be obtained by Seller in connection with the consummation of the transactions contemplated by this Agreement.  No

permit, license, consent, approval or authorization of, or filing with, any governmental regulatory authority or agency is required of Seller in connection with the execution, delivery and performance of this Agreement, or the consummation of the transactions contemplated hereby.

3.4   Transition Obligations. Seller agrees to comply with the terms set forth in Exhibit B, and to perform such obligations as set forth therein in good faith.

3.5   Title to Assets. Seller owns and has good title to the Assets, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("Encumbrances").

3.6   Intellectual Property.

(a)   "Intellectual Property" is limited, only for the purposes of this Section 3.6, to the following in any jurisdiction throughout the world: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing;  and (ii) websites and internet domain name registrations "Purchased IP" means the Assets that are Intellectual Property, and includes the Software.

(b)   Seller owns or has adequate, valid and enforceable rights to use all the Intellectual Property. To Seller's knowledge, Seller is not bound by any outstanding judgment, injunction, order or decree restricting the use of the Purchased IP, or restricting the licensing thereof to any person or entity.  With respect to registered Purchased IP, (i) all such Intellectual Property is valid, subsisting and in full force and effect and (ii) Seller has paid all maintenance fees and made all filings required to maintain Seller's ownership thereof. For all such registered Intellectual Property, Schedule 3.6 lists (A) the jurisdiction where the application or registration is located, (B) the application or registration number, and (C) the application or registration date.

(c)   Seller's prior and current use of the Intellectual Property has not and does not infringe, violate, dilute, or misappropriate the Intellectual Property of any person or entity and there are no claims pending or threatened by any person or entity with respect to the ownership, validity, enforceability, effectiveness or use of the Intellectual Property. To Seller's knowledge, no person or entity is infringing, misappropriating, diluting, or otherwise violating any of the Intellectual Property, and neither Seller nor any affiliate of Seller has made or asserted any claim, demand or notice against any person or entity alleging any such infringement, misappropriation, dilution or other violation.

3.7   Assigned Contracts. Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. To Seller's knowledge, Seller is not in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. Complete and correct copies of each Assigned Contract have been made available to Purchaser. To Seller's knowledge, there are no disputes pending or threatened under any Assigned Contract.

3.8   Compliance With Laws.  Seller has complied, and is now complying, with all applicable federal, state and local laws and regulations applicable to ownership and use of the Assets.  No permits, licenses, franchises, approvals, authorizations, registrations, certificates,

6

variances, or similar rights obtained from governmental authorities are required for the ownership and use of the Assets.

3.9   <u>Litigation</u>.  There are no lawsuits, judgments, arbitrations, administrative charges or other legal proceedings, claims or governmental investigations pending against, or to Seller's knowledge, threatened against Seller relating to or affecting the execution, delivery or performance of this Agreement or the ability of Seller to perform its obligations under this Agreement.

3.10   <u>No Broker or Finder</u>.  Seller has not employed or used the services of any broker or finder in connection with this transaction and shall hold Purchaser completely free and harmless from the claims of any person claiming to have so acted on behalf of Seller.

3.11   <u>Limitation on Warranty</u>.  Purchaser acknowledges and agrees that the Seller has not made any representation or warranty, expressed or implied, as to the Software or as to the accuracy or completeness of any information regarding the Seller or the Software, except as expressly set forth in this Agreement.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE SOFTWARE IS BEING TRANSFERRED TO PURCHASER ON AN "AS IS" BASIS AND PURCHASER ACCEPTS THE ENTIRE RISK AS TO THE QUALITY, PERFORMANCE AND RESULTS OF USE OF THE SOFTWARE. SELLER, ITS LICENSORS, AND THEIR RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, OR AGENTS, MAKE NO WARRANTIES OR REPRESENTATIONS, EXPRESSED OR IMPLIED, ORAL OR IN WRITING, WITH RESPECT TO THE SOFTWARE, INCLUDING ITS FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, QUALITY OR ITS NON-INFRINGEMENT. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER, ITS LICENSORS, AND THEIR RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, OR AGENTS WILL NOT BE LIABLE FOR ANY DAMAGES, INCLUDING INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS AND LOST DATA) ARISING OUT OF THE USE OF, OR THE INABILITY TO USE THE SOFTWARE BY PURCHASER OR ANY LICENSEES OF THE SOFTWARE.

**ARTICLE IV.   REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

4.1   <u>Existence and Good Standing; Corporate Actions</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation.  All corporate or other actions and proceedings necessary to be taken by or on the part of Purchaser in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, including the obtaining of approval by the directors of Purchaser (no Purchaser shareholder approval is required), have been duly and validly taken, and this Agreement has been duly and validly authorized, executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with and subject to its respective terms.

4.2   <u>No Defaults</u>.  Neither the execution, delivery or performance by Purchaser of this

Agreement nor the consummation by Purchaser of the transactions contemplated hereby is an event that, of itself or with the giving of notice or the passage of time or both, will:

> (a)  Violate or conflict with the provisions of constitutional or organizational documents of Purchaser;

> (b)  Violate or conflict with or result in any breach of or any default under, result in any termination or modification of, or cause any acceleration of any obligation under, any contract, mortgage, indenture, agreement, lease or other instrument to which Purchaser is a party or by which it is bound, or by which it may be affected, or result in the creation of any lien or encumbrance upon any of Purchaser's assets; or

> (c)  Violate any judgment, decree, order, statute, rule or regulation applicable to Purchaser.

4.3  Approvals and Consents.  No approvals or consents of persons or entities, not a party to this Agreement, are legally or contractually required to be obtained by Purchaser in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

4.4  Litigation.  There are no lawsuits, judgments, arbitrations, administrative charges or other legal proceedings, claims or governmental investigations pending against, or to Purchaser's knowledge, threatened against the Purchaser relating to or affecting the execution, delivery or performance of this Agreement or the ability of Purchaser to perform its obligations under this Agreement.

4.5  No Broker or Finder.  Purchaser has not employed or used the services of any broker or finder in connection with this transaction and shall hold Seller completely free and harmless from the claims of any person claiming to have so acted on behalf of Purchaser.

4.6  Transition Obligations.  Purchaser agrees to comply with the terms set forth in Exhibit B, and to perform such obligations as set forth therein in good faith.

## ARTICLE V.  COVENANTS.

5.1  Disclosure.  Without the prior written consent of the other Party, a Party will not make, and will direct its representatives not to make, directly or indirectly, any public comment, statement or communication with respect to, or otherwise to disclose or to permit the disclosure of this Agreement, except as required by law or legal process, or as may be required for a Party to enforce its rights hereunder.  Any disclosure by a Party of the transactions contemplated hereby, including but not limited to press releases and other disclosure, shall be made only after the other Party shall have been provided at least five (5) business days to review and comment thereon and shall have approved such disclosure, except as required by law or legal process, or as may be required for a Party to enforce its rights hereunder.  Each Party agrees to cooperate and use best efforts to seek a protective order to keep the details hereof confidential, if requested by

the other Party.  The foregoing shall not prevent either Party from disclosing any of the foregoing information to its counsel, accountants, shareholders, and actual and prospective lenders, investors, and parties to business combinations, so long as such parties are directed to keep such information confidential.

5.2     Health Intellectual Property.  Purchaser acknowledges that Seller has endeavored to remove all Health Intellectual Property in the Software prior to the Closing; provided, however, Purchaser and Seller acknowledge that the removal has not been verified and the transition services are required to complete the removal process . In the event that Purchaser becomes aware of any Health Intellectual Property in any of Purchaser's systems or equipment after the Closing, Purchaser shall promptly notify Seller and work with Seller to permanently delete such Health Intellectual Property under Seller's direct supervision. Because of the difficulty of measuring economic losses to Seller as a result of a breach of the foregoing covenant by Purchaser and of the immediate and irreparable damage that could be caused to Seller for which it would have no other adequate remedy, the parties agree that the covenants in this Section 5.2 may be enforced by Seller in the event of breach by injunctions and restraining orders and other equitable remedies (in addition to, but not in lieu of, any other available remedies). The remedies available to Seller for Purchaser's breach of or violation of this Section 5.2 shall not be limited by the terms set forth in this Section 5.2 or by any other provision of this Agreement.

5.3     Allocation.  Seller and Purchaser agree to allocate the Purchase Price among the Assets for all purposes (including tax and financial accounting) as set forth by Purchaser following the Closing, prior to December 31, 2018. Purchaser and Seller shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation

## ARTICLE VI.  INDEMNIFICATION; EFFECT OF BREACH.

6.1     Indemnification by Seller. Seller shall indemnify, defend and hold harmless Purchaser, its affiliates and their respective stockholders, directors, officers and employees from and against any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages (but not including consequential  or punitive damages, except to the extent a third party is entitled to recover the same from the relevant indemnified party), recoveries, and deficiencies, including reasonable attorneys' fees and costs (collectively, "Losses") that Purchaser may incur or suffer, which arise, result from, or relate to: (i) any inaccuracy of Seller's representations and warranties contained in this Agreement or in any agreement, instrument or document entered into pursuant hereto or in connection with the transactions contemplated hereby, (ii) any breach of or failure by Seller to perform any of its covenants or agreements contained in this Agreement and (iii) any Excluded Liabilities.  Seller shall not have any liability under this Section 6.1 unless Purchaser gives written notice to Seller asserting a claim for losses, including reasonably detailed facts and circumstances pertaining thereto (to the extent known).  Seller shall not have any liability under this Section 6.1 (a) with respect to matters covered by item (i) of this Section 6.1 (except for inaccuracies or breaches of Sections 3.1, 3.2, 3.5, and 3.10, which representations and warranties shall survive indefinitely) or (b) with respect of breaches of covenants or agreements

9

to be performed at or before Closing, unless Purchaser gives written notice to Seller asserting a claim for such losses, including reasonably detailed facts and circumstances pertaining thereto, before the expiration of two (2) years from the Closing. Any amount that is owed to Purchaser by Seller pursuant to this Agreement may be held back from any amounts that Purchaser owes to Seller under this Agreement.

6.2     Indemnification by Purchaser. Purchaser shall indemnify, defend and hold harmless Seller, its affiliates and their respective stockholders, directors, officers and employees from and against any and all Losses that Seller may incur or suffer, which arise, result from or relate to: (i) any inaccuracy of Purchaser's representations and warranties contained in this Agreement, (ii) any breach of or failure by Purchaser to perform any of its covenants or agreements contained in this Agreement, and (iii) Purchaser's obligations post Closing to the Employees, vendors, or clients of Purchaser or Gradient AI. Purchaser shall not have any liability under this Section 6.2 (a) with respect to matters covered by item (i) of this Section 6.2 (except for inaccuracies or breaches of Sections 4.1, 4.2, and 4.5, which representations and warranties shall survive indefinitely) or (b) with respect to breaches of covenants or agreements to be performed at or before Closing, unless Seller gives written notice to Purchaser asserting a claim for such losses, including reasonably detailed facts and circumstances pertaining thereto, before the expiration of two (2) years from the Closing.

6.3     Defense of Third Party Actions.

(a)     Promptly after receipt of notice of any written assertion of a claim, or the commencement of any action, suit, or proceeding, by a third party against a party to this Agreement ("Third Party Action"), the party in receipt of such notice who believes that it is entitled to indemnification under this Article 6 (the "Indemnified Party") shall give notice to the other party hereto (the "Indemnifying Party") of such action. The failure of the Indemnified Party to give such notice to the Indemnifying Party will not relieve the Indemnifying Party of any liability hereunder unless it was prejudiced thereby, nor will it relieve it of any liability which it may have other than under this Article 6.

(b)     Upon receipt of a notice of a Third Party Action, the Indemnifying Party shall have the right, at its option and at its own expense, to participate in and be present at the defense of such Third Party Action with its counsel, but not to control the defense, negotiation or settlement thereof, which control shall remain with the Indemnified Party, unless the Indemnifying Party makes the election provided in paragraph (c) below.

(c)     By written notice within 20 days after receipt of a notice of a Third Party Action, an Indemnifying Party may elect to assume control of the defense, negotiation and settlement thereof, with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall have the right, at its option and at its own expense, to participate in and be present at the defense of such Third Party Action with its counsel. The Indemnifying Party shall not in the defense of the Third Party Action enter into any settlement without the Indemnified Party's prior written consent, which consent shall not be unreasonably withheld, delayed, or conditioned.

10

   (d) If the Indemnifying Party does not elect to control the defense of a Third Party Action under paragraph (c) above, the Indemnifying Party shall promptly reimburse the Indemnified Party for reasonable expenses incurred by the Indemnified Party in connection with defense of such Third Party Action, as and when the same shall be incurred by the Indemnified Party.

   (e) Any party who has not assumed control of the defense of any Third Party Action shall have the duty to cooperate with the party that assumed such defense.

  6.4 <u>Tax Treatment of Indemnification Payments</u>. All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

## ARTICLE VII. DISPUTE RESOLUTION.

  7.1 <u>Direct Discussion</u>. In the event of any dispute, claim, question, or disagreement arising out of or relating to this Agreement (a "<u>Dispute</u>"), the Parties involved in such Dispute shall use their best efforts to settle such Dispute. To this effect, management of the Parties involved shall consult and negotiate with each other in good faith to attempt to reach a just and equitable solution satisfactory to both parties.

  7.2 <u>Arbitration</u>. All Disputes arising out of, or in connection with this Agreement shall be finally settled by arbitration under the Commercial Arbitration Rules of the American Arbitration Association (AAA) by three (3) arbitrators. Each party will appoint one arbitrator. The party appointed arbitrators will select a third arbitrator to act as chairman. If, within thirty (30) days of the last appointed arbitrator, such appointed arbitrators have not agreed on a chairman, then the chairman will be appointed by the Commercial Arbitration Rules of the AAA. If any party fails to appoint an arbitrator as provided above, the AAA will appoint such arbitrator. The place of arbitration will be New York, NY. The arbitral tribunal shall have the authority to permit limited discovery in accordance with the Federal Rules of Civil Procedure, including depositions, prior to the arbitration hearing. The decision of the arbitral tribunal will be final and may not be appealed. Judgment of the arbitral award may be entered by any court or courts of competent jurisdiction. The arbitral tribunal may, in its discretion, award fees and costs as part of its award. The arbitration shall be confidential, and except as required by law, neither party may disclose the contents or results of any arbitration hereunder without the prior written consent of the other party, except that disclosure is permitted to a party's auditors and legal advisors, or as required by law or legal process, or as may be required to enforce an aribitral award hereunder, or otherwise to enforce the rights of the parties hereunder.

## ARTICLE VIII. GENERAL PROVISIONS.

  8.1 <u>Expenses</u>. Each Party hereto shall bear all of its expenses incurred in connection with the transactions contemplated by this Agreement, including without limitation, accounting and legal fees incurred in connection herewith.

8.2     Further Assurances. From time to time prior to, on and after the Closing, each Party hereto will execute all such instruments and take all such actions as any other Party, being advised by counsel, shall reasonably request, without payment of further consideration, in connection with carrying out and effectuating the intent and purpose hereof and all transactions and things contemplated by this Agreement, including without limitation the execution and delivery of any and all confirmatory and other instruments in addition to those to be delivered on the Closing, and any and all actions which may reasonably be necessary or desirable to complete the transactions contemplated hereby. The Parties shall cooperate fully with each other in connection with any steps required to be taken as part of their respective obligations under this Agreement.

8.3     Successors and Assigns. Except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective representatives, successors and assigns, provided that the assigning Party shall remain jointly and severally liable with the assignee for its obligations and covenants hereunder.

8.4     Amendments; Waivers. The terms, covenants, representations, warranties and conditions of this Agreement may be changed, amended, modified, waived, discharged or terminated only by a written instrument executed by the Parties hereto or the Party waiving compliance, as applicable. The failure of any Party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right of such Party at a later date to enforce the same.  No waiver by any Party of any condition or the breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instance shall be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

8.5     Notices. All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (which shall include notice by electronic transmission) and shall be deemed to have been duly made and received when personally served, or when delivered by Federal Express or a similar overnight courier service, expenses prepaid, or, if sent by an electronic communication, delivered upon confirmation of delivery, addressed as set forth below:

> (a)     If to Purchaser, then to:
>
>> Arrowhead Technology Corp.
>> 150 Cambridgepark Drive
>> Cambridge, MA 02140
>> Attention: Stanford Smith
>>
>> with a copy to (which shall not constitute notice hereunder):
>>
>> BRL Law Group LLC
>> 425 Boylston Street, 3rd Floor
>> Boston, MA 02116

12

Attention: Mark W. Burgiel

(b)    If to Seller, then to:
Mary C. Clare
Senior VP & Chief Legal Officer
Milliman, Inc.
1301 Fifth Avenue
Suite 3800
Seattle, WA 98101
mary.clare @milliman.com

Any Party may alter the address to which communications are to be sent by giving notice of such change of address in conformity with the provisions of this Section 8.5 providing for the giving of notice.

8.6    <u>Assignment</u>. No party shall have the right to assign all or any portion of its obligations or interests in this Agreement without the prior written consent of the other party, except that either Party may assign any or all of its rights hereunder to any of its Affiliates or to its successor in interest by way of merger, reorganization or otherwise (but no such assignment shall relieve the assigning Party of its obligations hereunder).

8.7    <u>Captions</u>. The captions of the Articles and Sections of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

8.8    <u>Governing Law</u>. This Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to conflict of laws provisions thereof.

8.9    <u>Entire Agreement</u>. This Agreement and the other documents delivered hereunder constitute the full and entire understanding and agreement between the Parties with regard to the subject matter hereof, and supersedes all prior agreements, understandings, inducements or conditions, express or implied, oral or written, relating to the subject matter hereof, except as herein contained.

8.10    <u>Execution; Counterparts</u>. This Agreement may be executed in any number of counterparts, each of that shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.  This Agreement may be executed and delivered by facsimile transmission.

8.11   <u>Third Party Beneficiaries</u>.  Except as provided in Article VI, this Agreement shall not benefit or create any right or cause of action in or on behalf of any person other than the Parties hereto.

8.12   <u>Interpretation</u>.  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Schedules and Exhibits mean the Schedules and Exhibits attached to this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

8.13   <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

[Remainder of this page intentionally left blank]

14

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their authorized signatories as of the date first written above.

**PURCHASER:**

ARROWHEAD TECHNOLOGY CORP.

By: _____

Name: Stanford Smith
Title: President

**SELLER:**

MILLIMAN, INC.

By: _____

Name: Stephen A. White
Title: President & CEO

<u>**Exhibit A**</u>

<u>ASSETS</u>

The Assets consist of all of the assets and properties owned, held, or controlled by Seller with respect to the Gradient AI business, including, without limitation, the following assets and rights existing as of the Closing Date, excluding the Health Intellectual Property (collectively, the "<u>Assets</u>"):

   **1.1.1** All of the following software, in source code and object code/compiled code, and whether completed or as work in progress and:

   (a) The Gradient AI software  is a Software as a Service (SaaS) platform containing data management modules and solutions for workers compensation and professional liability claims. The solutions include functionality for underwriting, pricing and claims management.

   **1.1.2** All web pages (dynamic or static), portals, web designs, layouts, web libraries, business rules, algorithms, database structures and designs, engines, frameworks, scripts, specifications, interfaces and links and any other technical artifact relating to any of the foregoing Assets, and all domain names, including, without limitation, "gradientai.com."

   **1.1.3** All work in progress by the Gradient AI business, including any work in progress and relating to the Assets, excluding any Health Intellectual Property;

   **1.1.4** All source code, object code and other executables relating to any of the foregoing, for all existing platforms and environments, including the current and all existing prior versions thereof, and all code annotations with respect thereto;

   **1.1.5** All logs, manuals, documentation, maintenance and support information, development information, "as built" documentation, downloads, product descriptions, testing data, research, and other technical or engineering information and data, in whatever medium, with respect to any of the Assets;

   **1.1.6** The business and technical files, customer or prospect lists, marketing and promotional materials and other business and technical information of the Gradient AI business; .

   **1.1.7** All existing back-ups of any of the foregoing Assets;

   **1.1.8** All other proprietary know-how and technology of Seller or a Seller Party that is developed, used or held for use principally by the Gradient AI business;

   **1.1.9** All patches, fixes, updates, enhancements, improvements, modifications, extensions and derivative works of the Assets made or acquired by Seller, any Seller Party or their respective contractors and agents;

   **1.1.10** Any brands, trademarks and trade dress used solely in connection with the Gradient AI business but, for clarity, excluding any rights to the "Milliman" trademark;

   **1.1.11** All intellectual property rights embodied in or attendant to any of the Assets, including trade secret rights, copyrights and rights to patentable inventions;

   **1.1.12** An assignment of the Gradient AI business contracts listed on <u>Schedule 1.1.12</u> hereto ("<u>Assigned Contracts</u>");

16

**1.1.13** All deposits, credits, advance payments, prepaid expenses, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, charges, sums, and fees, in each case relating to the Gradient AI business, and other prepaid amounts made to Seller pursuant to the Assigned Contracts for services to be performed after the Closing Date;

**1.1.14** All copies and embodiments of the Assets, including the media in which any of the Assets is embodied; and

**1.1.15** All office furniture and computer equipment being used by the Gradient AI business, and software thereon (excluding any commercially available third party software subject to an enterprise-level license held by Seller) collectively, the "Equipment"), in their existing condition;

**1.1.16** All goodwill associated with the Gradient AI business;

**1.1.17** All accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing, in each case, related to work to be performed by the Gradient AI business after the Closing Date;

**1.1.18** All rights to any actions of any nature available to or being pursued by Seller to the extent relating to the Gradient AI business, the Assets, or the Assigned Contracts, whether arising by way of counterclaim or otherwise;

**1.1.19** All of Seller's rights under warranties, indemnties, and all similar rights against third parties to the extent related to any Assets; and

Schedule 1.1.12

Assigned Contracts

**License Agreements**

A.I.M Mutual Insurance Companies

Helpside (formerly: A Plus Benefits Company)

Athens Insurance Service Inc.

CIRMA (Connecticut Interlocal Risk Management Agency

CCMSI (Cannon Cochran Management Services, Inc.) FirstComp

Gallagher Bassett Services, Inc.

Gallagher Bassett Services, Inc.

IPMG

LUBA Casualty Insurance Company and Subsidiary

Meadowbrook, Inc.

Mitchell International

NBIS Construction and Transport Insurance Services, Inc.

Ports America Shared Services, Inc.

Safety National Casualty Corporation

StaffLink c/o Libertate Insurance LLC (contract includes Milliman HERO (a health service offering of Seller)

Synergy Coverage Solutions, LLC

The Builders Group (TBG)

Ironshore

<u>Vendor Agreements</u>

Lease Agreement: SPUS7 150 Cambridgepark, LP dated March 20, 2017

Tableau license

AWS agreement

Schedule 2.2

Employees

1. Doug Beethe
2. Vincent Ngyuen
3. Hyomin Choi
4. Steve Voinea
5. Ignacio Moreno
6. David Alfonso
7. Caitlin Riley
8. Daniel Wendt
9. Austin Smith
10. Chase Pettus
11. Stanford Smith

Schedule 3.6

Registered Intellectual property

None

## TRANSITION OBLIGATIONS

Purchaser and Seller agree to the following terms in connection with the transition of the Software to Purchaser:

1. Seller agrees to delete all known files containing Health Intellectual Property from the Cloud Environment prior to Closing.

2. Purchaser will maintain administrative rights to the Cloud Environment during the six (6) month period following the Closing Date, provided that, Seller may request an extension of this period for up to an additional six (6) months and Purchaser agrees not unreasonably withhold its consent to extend the term (the "Transition Period").

3. Following Closing, the Purchaser and Seller will each designate representatives to work together to identify any Health Intellectual Property maintained in the Cloud Environment and to delete or move such Health Intellectual Property as such representatives agree.

4. Seller shall have read only access to the Cloud Environment during the Transition Period. In addition, Seller shall have administrative rights to the Cloud Environment, provided that, the Seller agrees not to exercise any administrative rights during the Transition Period unless the Purchaser fails to cooperate in the removal of the Health Intellectual Property from the Cloud Environment.

5. Purchaser agrees that it shall not move any data or information contained in the Cloud Environment during the Transition Period without the Seller's prior written consent.

6. Any failure of Purchaser to cooperate with Seller regarding the obligations set forth in this Exhibit shall result in Seller's ability to immediately exercise its administrative rights to the Cloud Environment and to obtain injunctive relief as provided under the terms of Section 5.2 in the Agreement.

7. From and after the Closing, Seller shall, and shall cause its affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective representatives to hold, in confidence any and all information, whether written or oral, obtained in the Cloud Environment or otherwise pursuant to the transition obligations set forth herein, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its affiliates or their respective representatives; or (b) is lawfully acquired by Seller, any of its affiliates or their respective representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation, except as required by law, or legal or administrative process, in which case Seller shall promptly notify Purchaser in writing and shall disclose only that portion of

22

such information which Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

8. Seller will transfer emails of the Employees received or sent prior to Closing in a mutually agreeable format. In addition, for a period of ninety (90) days following the Closing, Seller will forward all emails received by the Employees' Milliman.com email domain from external parties (excluding any emails received from the following parties: @libertateins.com @stafflink.net @cobbsallen.com @lmcins.com @gcgfinancial.com @snellingswalters.com @paynewest.com @adp.com @justworks.com @realbenefitsgroup.com @swbc.com @aureon.com @littlebird.hr @nextep.com @gibsonins.com @integra-is.com @realbenefitsgroup.com @myaliat.com

, provided, however, that Seller shall promptly respond to such emails notifying the sender that the recipient is no longer an employee of Seller.

9. Following Closing, Purchaser will direct its Employees to not process any Health Intellectual Property on his/her laptop and will confirm that no Health Intellectual Property has been maintained on the laptop or other devices. Purchaser will instruct Employees to provide written confirmation of such action to Seller in a form to be provided by Seller.

10. Purchaser and Seller will enter into a mutually agreeable subcontract to allow for the provision by Seller of Milliman HERO services to Stafflink until the expiration of the one (1) year term. Purchaser will notify Stafflink of the termination of Milliman HERO from the agreement at least ninety (90) days prior to the expiration of the initial term.

11. Purchaser and Seller will enter into a mutually acceptable subcontract to allow for the provision by Purchaser to provide services under the agreement between Seller and MIMSA. Purchaser and Seller will mutually agree to a process of transferring or deleting the data related to the MIMSA project.

2

## BILL OF SALE

        For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Milliman, Inc., a Washington corporation ("Seller"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to Arrowhead Technology Corp., a Delaware corporation ("Purchaser"), all of its right, title, and interest in and to the Assets, as such term is defined in the Asset Purchase Agreement, dated as of June 29, 2018 (the "Purchase Agreement"), by and between Seller and Purchaser, to have and to hold the same unto Purchaser, its successors and assigns, forever.

        Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Purchaser in order to assign, transfer, set over, convey, assure and confirm unto and vest in Purchaser, its successors and assigns, title to the assets sold, conveyed and transferred by this Bill of Sale.

    IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of July 1, 2018.

        MILLIMAN, INC.

        By: _Stephen A. White_

        Name: Stephen A. White

        Title: President & CEO

## Assignment and Assumption Agreement

This Assignment and Assumption Agreement (the "Agreement"), effective as of July 1, 2018 (the "Effective Date"), is by and between Milliman, Inc., a Washington corporation ("Seller"), and Arrowhead Technology Corp., a Delaware corporation ("Purchaser").

**WHEREAS**, Seller and Purchaser have entered into a certain Asset Purchase Agreement, dated as of June 29, 2018 (the "Purchase Agreement"), pursuant to which, among other things, Seller has agreed to assign all of its rights, title and interests in, and Purchaser has agreed to assume certain of Seller's duties and obligations under, the Assigned Contracts (as defined in the Purchase Agreement).

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Definitions. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.  Assignment and Assumption. Seller hereby sells, assigns, grants, conveys and transfers to Purchaser all of Seller's right, title and interest in and to the Assigned Contracts. Purchaser hereby accepts such assignment and assumes all of Seller's duties and obligations under the Assigned Contracts and agrees to pay, perform, and discharge, as and when due, all of the obligations of Seller under the Assigned Contracts accruing on and after the Effective Date.

3.  Terms of the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Assigned Contracts are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.  Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any choice or conflict of law provision or rule.

5.  Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

6.  Further Assurances. Each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Assignment and Assumption Agreement to be effective as of the date first above written.

**SELLER:**

MILLIMAN, INC.

By: _Stephen H. White_

Name: _Stephen A. White_

Title: _President & CEO_

**PURCHASER:**

ARROWHEAD TECHNOLOGY CORP.

By: _[signature]_

Name:  Stanford Smith

Title:  President